# United States Court of Appeals
## For the First Circuit

---

No. 00-1340

INVEST ALMAZ,

Plaintiff, Appellant,

v.

TEMPLE-INLAND FOREST PRODUCTS CORPORATION,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. James R. Muirhead, U.S. Magistrate Judge]

---

Before

Boudin, Circuit Judge,
Bownes, Senior Circuit Judge,
and Stahl, Circuit Judge.

---

Mark H. Alcott, with whom John F. Baughman and Paul, Weiss, Rifkind, Wharton & Garrison, were on brief, for appellant.
Russell F. Hilliard, with whom Charles W. Grau and Upton, Sanders & Smith, were on brief, for appellees.

---

March 16, 2001

---

**STAHL, Circuit Judge**. Plaintiff-appellant Invest Almaz appeals from adverse rulings of the district court regarding claims arising out of a failed attempt to purchase manufacturing equipment from defendant-appellee Temple-Inland Forest Products Corporation ("Temple-Inland"). Invest Almaz contends that the district court abused its discretion by failing to order restitution of funds retained by Temple-Inland after the deal collapsed and by erroneously granting Temple-Inland's motion for judgment as a matter of law on Invest Almaz's fraud claims. Invest Almaz also contends that the jury was not properly instructed on a claim that, in the course of these events, Temple-Inland aided and abetted Invest Almaz's joint venture partner, Pathex International Ltd. ("Pathex"), in breaching its fiduciary duty to Invest Almaz. We affirm.

I.

Invest Almaz, a subsidiary of a Russian company engaged in diamond mining, was formed for the purpose of investing the pensions and savings of the parent company's employees. In early 1993, Invest Almaz became interested in developing a plant to manufacture oriented strand board ("OSB"), a wood and wafer resin board used as a construction material. Invest Almaz's intent was to build housing for the parent company's retired employees and also to sell OSB for needed hard currency in the

-3-

export market. After considering the possibility of building a new plant for this purpose, Invest Almaz came to the conclusion that it would be more cost-effective to purchase the equipment from an existing plant in North America and have it transported back to Russia.

With this in mind, Invest Almaz entered into discussions with Pathex,[1] a Canadian corporation with expertise in the field, regarding the formation of a joint venture to effectuate these plans. Under the arrangement contemplated by the parties, Pathex would select and procure suitable equipment from an existing plant, transport it to Russia, reconstruct and upgrade the equipment once transported, and maintain it thereafter. Invest Almaz would provide the capital, as well as the land, labor and materials in Russia. During these negotiations, Pathex allegedly represented that acquiring suitable OSB manufacturing equipment would cost more than $17 million.[2]

_____

[1] Some of Pathex's actions with respect to these events were undertaken through subsidiaries. For simplicity, we refer to these entities collectively as "Pathex" unless otherwise identified.

[2] There is some dispute as to what this estimate was understood to include. Invest Almaz contends that Pathex quoted a purchase price of $17.25 million. Temple-Inland argues that the price was understood to cover purchase, disassembly and renovation of the equipment with only $8 million allocated to the purchase price. We do not consider the difference

-4-

Unbeknownst to Invest Almaz, Pathex was at this time already engaged in negotiating an option to purchase a Claremont, New Hampshire OSB plant from Temple-Inland (a Delaware corporation) for $5 million. The plant was complete and operational, although it had been closed since 1988 because it could not compete with newer plants in the North American market. The option was structured to allow Pathex access to the plant and the site prior to deciding whether to go forward with the transaction. In addition, the option gave Pathex the choice of purchasing the entire facility, including real estate,[3] or only the equipment and buildings.[4] Although the option agreement was finalized on August 5, 1993 -- before the joint-venture agreement between Invest Almaz and Pathex was signed -- its contents were never disclosed to Invest Almaz.

In late September 1993, representatives from Invest Almaz traveled to Canada to finalize the joint-venture agreement

---

particularly germane to our analysis, especially as either estimate exceeded the price Pathex actually expected to pay.

[3] While only the equipment was of interest to Invest Almaz, Pathex was willing to consider taking the real estate -- at no additional cost -- for possible resale. This issue was left open in the option agreement because of questions concerning the value of the real estate and the extent of environmental contamination at the site.

[4] The option required Pathex to purchase the buildings because removal of the equipment would, in at least some instances, require the buildings to be dismantled.

with Pathex. Pathex arranged with Temple-Inland for Invest Almaz's representatives to tour the Claremont OSB plant during their stay, and Vladimir Semkin and Viktor Tikhov, both engineers employed by Invest Almaz, were shown the facility by Temple-Inland employee Earl Taylor. Semkin and Tikhov were given written information about the plant and afforded considerable opportunity to inspect the plant's equipment and ask questions of Taylor, although Invest Almaz later came to believe that the information it obtained about the equipment was not entirely accurate, candid or complete.

Invest Almaz formally entered into the joint-venture agreement with Pathex on October 4, 1993. The agreement detailed the respective obligations of Invest Almaz and Pathex, requiring Invest Almaz to contribute in excess of $21 million in "investments and services" to the overall project and Pathex to contribute a little less than half that amount, all in services. The agreement also established a schedule for Invest Almaz's payments. Although the agreement did not specifically identify Temple-Inland's facility as the source of the equipment that would be purchased by the joint venture, Invest Almaz's officials testified that they understood this to be the case, and there is no evidence in the record that any other facility was under consideration at the time.

While the final negotiations with Invest Almaz were taking place, Pathex exercised its right under the option agreement to inspect the Claremont plant, making a number of visits with its own personnel, commissioning a professional appraisal of the plant and requesting two assessments from an environmental consultant, Aries Engineering ("Aries"). The appraisal, received by Pathex in December 1993, revealed, among other things, that the property and buildings were assessed for tax purposes at $1.6 million. The environmental assessments, received in March and May 1994, indicated that, while in operation and subsequent to its closure, the plant had run afoul of environmental regulations, including those governing wastewater discharges and hazardous materials storage. The Aries report noted the presence of lead and other potentially hazardous substances in site soils and sediments, petroleum-related contamination in the groundwater, and contaminant stains on cement at various locations in the facility. Invest Almaz never received copies of any of these documents from Pathex, nor was it informed of the information they contained.

In March 1994, Pathex, through a subsidiary, exercised its option to purchase the equipment at the Claremont plant. Because of the environmental problems identified by Aries, Pathex decided not to acquire the real estate. The Asset

Purchase Agreement Pathex and Temple-Inland executed provided for $2 million to be paid at the closing and the remaining $3 million to be remitted in the form of a non-recourse promissory note,[5] payable in three installments. The parties also executed a Security Agreement, giving Temple-Inland a security interest in the equipment. Invest Almaz was not informed by Pathex of the terms of the Asset Purchase Agreement or the Security Agreement.

Invest Almaz almost immediately failed to meet the schedule of payments laid out in the joint-venture agreement,[6] although it did eventually transfer over $6 million to Pathex pursuant to that agreement. Of this amount, Pathex paid approximately $2.3 million to Temple-Inland and used the

---

[5] Although the promissory note indicates that there is no recourse to Pathex, this provision is inconsistent with language in the accompanying Security Agreement, which provides that, in the event of default and foreclosure, Pathex would remain liable for any deficiency (and also could recover any surplus). Because the promissory note specifically states that, if there is a default, "Payee [Pathex] shall look to the security interests referenced in the . . . security agreement . . . for satisfaction of payment of any amounts due", we think it likely that the Security Agreement language would control. However, resolution of this anomaly is not ultimately necessary to our analysis.

[6] The first two installments required by the agreement were $7.22 million in November 1993 and $5.5 million in February 1994. The record indicates that Invest Almaz's first payment was made in February 1994 and was for only $1.3 million. A second payment of $3.5 million was made in March 1994 and two smaller payments were made in the fall of 1994.

remainder for other purposes.[7]  The bulk of the funds paid to Temple-Inland went towards the $2 million down payment required by the Asset Purchase Agreement.  Subsequently, and in part as a result of Invest Almaz's inability to make its own payments to the joint venture, Pathex failed to make the three installments required by the Agreement.  After negotiating a series of extensions with Temple-Inland -- and paying Temple-Inland a further $300,000 in delinquency payments -- Pathex defaulted on the debt.[8]

The Security Agreement gave Temple-Inland the right to foreclose on the equipment to satisfy the debt in the event of a default by Pathex.  The Agreement also specified that, in the event of foreclosure, Temple-Inland would have to account to Pathex for any surplus resulting from the sale, while Pathex would be responsible for any deficiency.  Temple-Inland chose not to foreclose, however.  Instead, Temple-Inland and Pathex

---

[7]  Approximately $1.5 million of the Invest Almaz payments were diverted, at Invest Almaz's request, to a third party, Burnell Limited, for purposes which are the subject of dispute. The record does not detail the disposition of the remainder, although Charles Kosa, former President of Pathex, testified that what was not paid to Temple-Inland pursuant to the Asset Purchase Agreement was used to defray other costs associated with inspecting and purchasing the plant and implementing the joint-venture agreement.

[8]  The final extension negotiated between Pathex and Temple-Inland ran out on December 2, 1994.

negotiated a "Mutual Release and Cancellation of Debt" (the "Mutual Release"). Under the Mutual Release, Pathex's $3 million debt was cancelled, and Temple-Inland regained title to the purchased assets. Temple-Inland also was allowed to retain the $2.3 million in payments already made by Pathex. In addition, each party gave up any claims it might have had against the other arising out of the Asset Purchase Agreement and associated documents. The Mutual Release was executed by Pathex on December 13, 1994. Although Invest Almaz was informed at the time that Pathex was "terminating" the project, Invest Almaz was not involved in the discussions concerning the Mutual Release and was never informed of its terms.

In late 1996, attorneys representing Invest Almaz contacted Pathex in an effort to determine what had become of the funds Invest Almaz contributed to the joint venture. Shortly thereafter, however, Pathex filed for bankruptcy. Invest Almaz commenced the present action against Temple-Inland in August 1997, filing a complaint that initially included only an unjust enrichment count. The complaint was amended in October 1997 to include an allegation that Temple-Inland had aided and abetted Pathex in breaching a fiduciary duty to Invest Almaz. Nearly two years later, in June 1999, Invest Almaz was

allowed to amend its complaint once again, this time to add a fraudulent concealment count.

The fraud and aiding and abetting claims were tried to a jury while the unjust enrichment count was tried to the court. The trial took place in December 1999, before Magistrate Judge James Muirhead.[9] At the end of plaintiff's case, Temple-Inland moved for judgment as a matter of law on the fraud and aiding and abetting claims. Invest Almaz, in its response, sought recognition that its fraud count also encompassed a theory that Temple-Inland made affirmative misstatements to Invest Almaz. Magistrate Judge Muirhead refused Invest Almaz's request to include an affirmative fraud count in the case and granted Temple-Inland's motion for judgment as a matter of law on the existing fraudulent concealment count. The magistrate judge denied Temple-Inland's motion with respect to the aiding and abetting count and that count went to the jury. The jury subsequently found in favor of Temple-Inland.

On February 8, 2000, the magistrate judge issued a Memorandum and Order denying Invest Almaz's unjust enrichment claim. The same day, final judgment was entered, incorporating

---

[9]     Magistrate Judge Muirhead exercised jurisdiction over the case by consent of the parties, pursuant to 28 U.S.C. § 636(c).

the magistrate judge's orders and the jury's verdict.  This appeal followed.

## II.

On appeal, Invest Almaz challenges the magistrate judge's rulings with respect to the unjust enrichment and fraud claims and his instructions to the jury with respect to the aiding and abetting claim.  For the reasons set forth below, we affirm the judgment of the district court in all respects.

A.          Unjust Enrichment

It is undisputed that when the dust settled on Invest Almaz's failed attempt to purchase the Claremont plant, Temple-Inland held title to the plant and also retained the approximately $2.3 million in payments it had received from Pathex. The question on appeal is whether, under the circumstances, the magistrate judge erred in concluding that Temple-Inland was not unjustly enriched by this outcome.[10]

In New Hampshire common law, "[t]he doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity." Cohen v. Frank Developers, Inc., 389 A.2d 933, 938 (N.H. 1978). A defendant is unjustly enriched, and a plaintiff is entitled to

---

[10] The body of this opinion analyzes in detail Invest Almaz's restitution arguments under New Hampshire common law principles. However, Invest Almaz's brief also presses a second claim for restitution premised on section 201(1) of the Restatement (Second) of Restitution. Section 201(1) provides that "[w]here a fiduciary in violation of his duty to the beneficiary transfers property or causes property to be transferred to a third person, the third person, if he gave no value or if he had notice of the violation of duty, holds the property upon a constructive trust for the beneficiary."
The magistrate judge rejected this claim on the alternative grounds that: (1) it was not clear that a New Hampshire court would adopt the principle contained in section 201(1); and (2) Invest Almaz had failed to prove that Temple-Inland either had notice of Pathex's wrongdoing or failed to provide value. Finding nothing in Invest Almaz's conclusory arguments on appeal sufficient to disturb the magistrate judge's ruling with respect to this theory of recovery, we affirm the magistrate judge's conclusion for the reasons set forth in his opinion.

-13-

restitution, when the court determines that the defendant has "received a benefit and it would be unconscionable for the defendant to retain that benefit." Nat'l Employment Serv. Corp. v. Olsten Staffing Serv., Inc., 761 A.2d 401, 406 (N.H. 2000). Of relevance in this case, a plaintiff in an unjust enrichment case need not prove that the defendant obtained the benefit through wrongful acts; passive acceptance of a benefit may also constitute unjust enrichment. R. Zoppo Co. v. City of Manchester, 453 A.2d 1311, 1313 (N.H. 1982); see also Petrie-Clemons v. Butterfield, 441 A.2d 1167, 1172 (N.H. 1982) ("Unjust enrichment may exist when an individual receives a benefit as a result of his wrongful acts, or when he innocently receives a benefit and passively accepts it."). Nor does unjust enrichment require a contractual relationship between the plaintiff and defendant. Presby v. Bethlehem Vill. Dist., 416 A.2d 1382, 1383 (N.H. 1980). However, more than a moral claim for reimbursement is required for restitution to be justified. Cohen, 389 A.2d at 937. Instead, "[t]here must be some specific legal principle or situation which equity has established or recognized to bring a case within the scope of the doctrine." Id. Finally, in determining the extent to which a defendant may have been unjustly enriched, "the focus is not upon the cost to the

plaintiff, but rather it is upon the value of what was actually received by the defendants." R. Zoppo Co., 453 A.2d at 1314.

The magistrate judge found that, because Invest Almaz was the source of the $2.3 million paid to Temple-Inland by Pathex, Invest Almaz had conferred a "benefit" on Temple-Inland. However, he concluded that equity did not entitle Invest Almaz to restitution for two reasons. First, he found that Temple-Inland either provided value for or was otherwise legally entitled to retain all of the $2.3 million it received from Pathex. One million dollars of this amount represented option payments ($700,000) made prior to the sale[11] or delinquency payments ($300,000) made after the closing to avoid a default on the promissory note. The magistrate judge found that Temple-Inland gave full value for these amounts, by keeping the plant off the market during the option period and by agreeing to extend the payment schedule after the sale, and was not required to return them. A further $320,000 was not subject to restitution because it defrayed a payment Temple-Inland was required to make to

---

[11]     Pathex paid $150,000 for the initial option with the right to extend for four more months for $100,000 per month. Temple Inland ultimately allowed Pathex to extend the option still further for another $150,000, resulting in a total of $700,000 in option payments being made to Temple-Inland. Pursuant to the option agreement's terms, that amount was credited towards the $2 million down payment required by the Asset Purchase Agreement.

-15-

General Electric ("GE") if the equipment was removed from the plant, as Invest Almaz's plans required.[12] With respect to the remaining $980,000, the magistrate judge relied on the principle that a payor typically cannot recover in restitution from a payee who accepts a payment in satisfaction of a third party's debt -- even if it turns out the payor made the payment by mistake. See United States v. Bedford Assocs., 713 F.2d 895, 904 (2d Cir. 1983) (holding that restitution is not available against a defendant "where the defendant has received the payment in good faith and used it in satisfaction of the debt of a third person to the defendant"); Equilease Corp. v. Hentz, 634 F.2d 850, 853 (5th Cir. 1981) ("It is patently unfair to require an innocent payee who has received and used the money to satisfy a debt to repay the money."). See generally Greenwald v. Chase Manhattan Mortgage Corp., No. 00-1447, ___ F.3d ___, slip op. at 7-10 (1st Cir. March 2, 2001) (analyzing and applying this principle in a case involving Massachusetts law). Because Temple-Inland

---

[12] This payment was made pursuant to a tax benefit transfer agreement executed in 1981 by GE and the prior owner of the facility. The agreement provided GE with certain tax benefits if the equipment remained in use at the plant for fifteen years. When Temple-Inland sold the equipment to Pathex for removal to Russia, GE incurred a tax liability in the amount of $320,000 that Temple-Inland was required to reimburse. The magistrate judge found this expense chargeable against Invest Almaz because it would not have been incurred if Temple-Inland had sold the plant to a buyer that did not intend to remove the equipment.

innocently received the money as partial payment on Pathex's debt, the magistrate judge reasoned, Temple-Inland was entitled to keep it.

In the alternative, the magistrate judge held that Invest Almaz's restitution claim failed because Invest Almaz had introduced no evidence demonstrating that Temple-Inland was unfairly advantaged by the outcome resulting from the Mutual Release. Invest Almaz could have met its burden, the magistrate judge suggested, with evidence establishing that a sale of the secured assets (the equipment) would have yielded an amount larger than the $3 million Pathex still owed on the promissory note. Under the Security Agreement and New Hampshire law, any such excess would have been returned to Pathex and potentially could have been recovered by Invest Almaz. However, the court found that Invest Almaz had "failed to present any evidence that the equipment could have been sold at auction for an amount greater than the . . . debt owed by Pathex." In the absence of such evidence, it was "neither unreasonable nor unconscionable to allow Temple Inland to retain both the collateral and the funds [Pathex] paid . . . ."

Familiar standards govern our review of the magistrate judge's conclusions. The factual findings underlying the magistrate judge's determination are reviewed for clear error.

Fed. R. Civ. P. 52. By contrast, the magistrate judge's "articulation and application of legal principles is scrutinized de novo." Texas P.R., Inc. v. Dept. of Consumer Aff., 60 F.3d 867, 874 (1st Cir. 1995). As a corollary of the latter principle, findings of fact "predicated upon, or induced by, errors of law . . . will be accorded diminished respect on appeal." Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st Cir. 1992). Finally, to the extent that the ultimate decision in a restitution case rests on a judgment regarding the equities of the case, rather than application of an established rule of restitution,[13] that exercise of judgment is reviewed only for abuse of discretion, reflecting our view that the finder of fact "who has had first-hand exposure to the litigants and the evidence is in a considerably better position to bring the scales into balance than an appellate tribunal." Texas P.R., 60 F.3d at 875 (quoting Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 323 (1st Cir. 1989)); see also Pella Windows & Doors, Inc. v. Faraci, 580 A.2d 732, 733 (N.H. 1990) ("Unless

---

[13] We have recently noted that, although "[t]he origins of unjust enrichment actions largely lie in equity," many restitution decisions involve the application of restitution "rules," such as those articulated in the Restatement of Restitution (1936), rather than purely equitable judgments as to the fair or just result. Greenwald, slip op. at 12. To the extent that a decision relies upon the "articulation and application" of such rules, a less deferential standard of review is arguably appropriate. See Texas P.R., 60 F.3d at 874.

-18-

it is unsupported by the record, we generally defer to the trial court's determination as to whether the facts and equities of a particular case warrant [restitution].").

Bearing in mind the foregoing, we conclude that Invest Almaz has not demonstrated that the magistrate judge abused his discretion in ruling for Temple-Inland on the unjust enrichment claim. Invest Almaz's argument that the magistrate judge improperly analyzed the value Temple-Inland provided and costs it incurred is largely conclusory and, with one exception, wholly without merit.[14] With respect to the $1 million in option and delinquency payments made by Pathex, Invest Almaz states only that there is "no evidence that Temple-Inland gave up a thing" in exchange for these funds. This assertion is directly at odds with the magistrate judge's finding that Temple-Inland did provide the bargained-for consideration, in the first instance by keeping the plant off the market for the agreed period of time[15]

---

[14] In its preface to the arguments analyzed in the body of this opinion, Invest Almaz contends that the court should not have even attempted an independent analysis of costs incurred and value provided because an internal memorandum from Temple-Inland's financial officer showed a "profit" on the transaction of $1,478,156. This is frivolous. As Temple-Inland correctly notes, such internal calculations of cash flow are not equivalent to a legal analysis of the benefits and burdens resulting from a transaction.

[15] Invest Almaz makes much of the fact that no other purchasers appeared during the option period. However, Invest Almaz cites no precedent, in New Hampshire or elsewhere,

-19-

and in the second by extending the deadline for Pathex to make payments under the Asset Purchase Agreement. Invest Almaz does not suggest that the magistrate judge was wrong in finding that Temple-Inland fulfilled its obligations under the two agreements. Nor does Invest Almaz point to any evidence indicating, for example, that the amount paid by Pathex for the option was grossly unfair. Under the circumstances, we see no reason to conclude that the magistrate judge erred in finding that Temple-Inland "gave full value" for the $1 million received under the option agreement or the subsequent extension payments.

So too, Invest Almaz provides no convincing reason for us to conclude that the magistrate judge erred in allowing Temple-Inland to retain a further $320,000 because of the payment made to GE. Invest Almaz's sole argument is that the magistrate judge improperly credited the testimony of George Vorpahl, Temple-Inland's general counsel, who stated that the payment would not have been required if the equipment were sold to most other buyers, over that of Stacey Cooke, a financial analyst at Temple-Inland, who stated that the payment would have been required no matter who purchased the property. Had the magistrate judge relied on the proper testimony, Invest Almaz

supporting its argument that Temple-Inland therefore failed to "give value" in exchange for the payments.

-20-

contends, he would have concluded that the payment was not attributable to this particular sale and therefore could not be offset against the payments Temple-Inland received. We are not inclined to second-guess the magistrate judge's reasoned conclusions concerning the credibility of competing testimony, especially as Invest Almaz gives us no reason to believe that the magistrate judge's decision was in fact incorrect.

With respect to the remaining $980,000 paid to Temple-Inland, Invest Almaz first suggests that New Hampshire law does not recognize the principle that a payor cannot recover in restitution from a payee who accepts a payment in satisfaction of the debt of a third party. Invest Almaz is incorrect. See Winslow v. Anderson, 102 A. 310, 312 (N.H. 1917) (holding that, where plaintiff mistakenly overpaid the creditor of a third party, and the amount of the overpayment was innocently accepted by the creditor as payment for additional debts owed by the third party, equity would not require creditor to refund the amount of the overpayment; plaintiff's only cause of action was against the third party, who benefitted from the mistake).

Invest Almaz's second and more compelling contention is that the factual circumstances of this case counsel against application of the foregoing rule to offset the $980,000 payment.

Invest Almaz correctly notes that there is no indication in the cases cited by the magistrate judge that the innocent creditor/defendant ultimately received more than the third-party debtor owed. The same appears to be true of Winslow. As a result, the possibility of the defendant enjoying a double recovery was not presented in these cases; the only issue before each court was whether the plaintiff could get his money back from the innocent defendant who was actually paid or had to pursue the (unintentionally benefitted) third-party debtor instead. By contrast, Temple-Inland ultimately received money from Invest Almaz (via Pathex) and the facility from Pathex. To the extent that this resulted in Temple-Inland recovering more than the amount it was owed by Pathex, Invest Almaz argues, these cases do not preclude Invest Almaz from obtaining restitution.

Invest Almaz's argument has a certain logic and is not without precedential support. See Strubbe v. Sonnenschein, 299 F.2d 185, 192 (2d Cir. 1962) (holding, as an exception to the general rule, that restitution is justified to the extent that a payment to a third party's creditor "exceed[s] the amount due [the creditor] from [the third party]"); see also Bedford Assoc., 713 F.2d at 904 (distinguishing a case in which the creditor ultimately received less than the total amount it was owed from situation posed by Strubbe). However, accepting arguendo that

-22-

Invest Almaz is correct, we think it evident that winning this point does not conclusively resolve the issue in Invest Almaz's favor. If Invest Almaz can potentially recover the excess Temple-Inland received over Pathex's debt, the question becomes whether, as a factual matter, Temple-Inland actually <u>has</u> recovered more than it was properly owed by retaining the plant plus the $980,000. The magistrate judge, in his alternative holding, concluded that this had not been established. As a result, all Invest Almaz's argument accomplishes is to make the third part of the magistrate judge's offset analysis contingent on his assessment of whether Temple-Inland recovered more than was equitable as a result of the Mutual Release. Accordingly, we turn to that question.

Invest Almaz raises two challenges to the magistrate judge's analysis of the outcome of the Mutual Release. First, Invest Almaz argues that, by requiring Invest Almaz to offer proof that the value of the plant at auction would exceed the $3 million remaining on the promissory note, the magistrate judge "introduced an element that simply is not part of a claim of unjust enrichment, and then assigned Invest Almaz the burden of proof on that element." Invest Almaz offers no support for this position and we find it unpersuasive. In order to establish that Temple-Inland was unjustly enriched, Invest Almaz plainly had the

burden of proving the extent to which Temple-Inland was benefitted by the transaction in question. See, e.g., Moore v. Knight Founds., Inc., 444 A.2d 546, 547 (N.H. 1982). We see no error in the magistrate judge's methodology, which used the amount that could be realized in a foreclosure sale as the benchmark of the value of the plant at the time Pathex defaulted. To the contrary, that approach is substantially in accord with other cases using the market value of property to measure the extent to which a party may have been unjustly enriched. See Petrie-Clemons, 441 A.2d at 1172 (holding that, where plaintiffs sought restitution for improvements made to premises leased from defendants, the "appropriate basis for determining the amount of the defendant's benefit is the difference between the market value of the realty before and after the improvements"); see also Moore, 444 A.2d at 547 (reversing restitution award to plaintiff for improvements made to house prior to purchase where "plaintiff presented no evidence as to any increase in the fair market value of the real estate . . ."). The magistrate judge's approach also strikes us as reasonable in light of the terms of the Security Agreement, which specified that Temple-Inland could retake and sell the collateral in the event of a default and apply the net proceeds (after deducting the costs of the sale) towards the amount due on the note. Under this provision, there would have

been no question of a surplus arising unless the net proceeds of a foreclosure sale, after costs, exceeded the remaining indebtedness.[16]

Indeed, the magistrate judge's approach could be considered generous to Invest Almaz's case, because it assigns no value to what Pathex and, indirectly, Invest Almaz, gained by avoiding foreclosure. Under the Security Agreement, if the amount realized at auction had been less than the $3 million remaining on the note, Pathex could have been liable for the deficiency. Agreeing to the Mutual Release avoided the possibility of such a deficiency being assessed against Pathex.

Invest Almaz's second argument on this point is that the magistrate judge improperly failed to consider the evidence it did present concerning the value of the plant's assets at the time of the default. Invest Almaz's evidence showed that, in May 1996, Temple-Inland entered into an agreement to sell the Claremont plant for $5 million to another buyer, Ced-Or, Inc. ("Ced-Or"). The transaction ultimately fell through, for reasons the parties do not explain. At trial, Invest Almaz offered this

---

[16]    As the magistrate judge noted, this would also be the result under the applicable provisions of the New Hampshire Uniform Commercial Code. See N.H. Rev. Stat. Ann. § 382-A:9-504 (discussing secured party's right to dispose of collateral after default and the order in which the proceeds of disposition are to be applied).

evidence in support of its contention that the value of the plant was approximately $5 million in December 1994, when Pathex defaulted. The magistrate judge ruled the evidence inadmissible, suggesting that significant changes in the economic climate during the intervening period, of which he took judicial notice, rendered the later transaction irrelevant to the value of the plant at the earlier time.[17]

On appeal, Invest Almaz contends that the magistrate judge improperly "chose to rely on personal and anecdotal experience outside the record" in making his ruling on the evidence. According to Invest Almaz, whether prices were depressed in 1994, and whether the economy had begun to improve

---

[17] With respect to the economic conditions at the time of the default the magistrate judge stated:

> In 1995, when every big bank in this state had gone down the tubes, when people -- when the real estate price, when all other prices in this state were incredibly depressed, a fact of which I cannot but take judicial notice because I lived here during that time -- and in fact I practiced commercial litigation during that time and had enough lender liability cases to fill file drawers and tried those cases. You know it's smoke and mirrors to say you would have sold that equipment for $3 million.

Shortly thereafter, when Invest Almaz's counsel pressed the Ced-Or agreement, the magistrate judge added:

> What somebody is willing to pay a year or two later in an economic climate which had hit the bottom and was on its way up is not evidence of what somebody would have paid at a foreclosure sale in 1995.

by 1996, are questions "subject to reasonable dispute," and therefore not proper subjects of judicial notice under Fed. R. Evid. 201. See Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); see also Coalition for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 15 F. Supp. 2d 918, 928 (Ct. Int'l Trade 1998) (refusing, pursuant to Fed. R. Evid. 201, to take judicial notice of the fact that the economy grew and light auto sales increased in 1996). As a result, Invest Almaz argues, the magistrate judge's reliance on this information as a basis for rejecting the Ced-Or evidence constituted an abuse of discretion. See United States v. Pitrone, 115 F.3d 1, 7 (1st Cir. 1997) (stating that decisions regarding admissibility of evidence are reviewed for abuse of discretion); see also United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992) (noting that an abuse of discretion may be found "when a relevant factor . . . is overlooked, or when an improper factor is accorded significant weight . . .").

We find Invest Almaz's argument unavailing. To begin with, we are not convinced that the magistrate judge had any

-27-

obligation to meet the judicial notice requirements of Fed. R. Evid. 201 under the circumstances presented here. As Fed. R. Evid. 104(a) and 1101(d)(1) make clear, Fed. R. Evid. 201 typically does not apply to facts considered by a court when ruling on the admissibility of evidence. See Fed. R. Evid. 104(a) (stating that, when deciding "[p]reliminary questions concerning . . . the admissibility of evidence[,] . . . [the court] is not bound by the rules of evidence except those with respect to privileges"); Fed. R. Evid. 1101(d)(1) (stating that the Federal Rules of Evidence, except with respect to privileges, are "inapplicable . . . [to] [t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104"); see also 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5103, at 479 (1977) ("Where the judge is taking judicial notice of a fact for the purpose of ruling on the admissibility of evidence, he may do so without regard to Rule 201."). Nor do we consider Invest Almaz's summary argument that the state of the New Hampshire economy is "subject to reasonable dispute" persuasive as to whether the requirements of Fed. R. Evid. 201(b), even if applicable, were violated in this instance.

However, we need not reach the judicial notice issue, as we conclude that the magistrate judge's finding that value had

not been established is supportable even if the magistrate judge erred in considering the state of the New Hampshire economy. The fact that the Ced-Or transaction occurred nearly eighteen months later would undercut its probative value in any event, as would the fact that the Ced-Or deal ultimately fell apart. We find in the record no corroborative evidence, such as expert testimony, supporting Invest Almaz's contention that the Ced-Or price of May 1996 was a good indicator of the plant's value in December 1994. Absent such evidence, we think the magistrate judge reasonably could have concluded that the mere fact of the Ced-Or transaction was inadequate to establish the value of the plant.

Having accepted the magistrate judge's conclusion that Invest Almaz did not establish that the plant's value exceeded the $3 million owed on the promissory note, Invest Almaz's restitution claim fails under either prong of his analysis. Absent proof that Temple-Inland recovered more than it was owed, Invest Almaz's argument that it is entitled to recover the last $980,000 of the amount paid by Pathex evaporates, for reasons already discussed. Given our agreement with the remainder of the magistrate judge's analysis of value given and costs incurred by Temple-Inland, there is no "enrichment" left on which an unjust enrichment claim could be premised. In addition, Invest Almaz's failure to introduce adequate evidence regarding the value of the

plant precludes its restitution claim on a more fundamental level: without adequate evidence of the value left in Temple-Inland's hands at the end of the day, there is no proof that Temple-Inland experienced a net benefit even if the magistrate judge's various offsets were disregarded. Affirmance is justified on either ground.

B.      Fraud

On appeal, Invest Almaz challenges both the magistrate judge's denial of its belated motion to add an affirmative fraud count to its complaint and the magistrate judge's ruling granting Temple-Inland judgment as a matter of law on its fraudulent concealment count. We treat each in turn.

1. <u>Refusal to Allow Invest Almaz to Add Affirmative Fraud Count</u>

As previously noted, Invest Almaz did not assert its affirmative misrepresentation claims until very late in the proceedings. No allegations of affirmative fraud were included in Invest Almaz's second amended complaint, nor was this theory of the case identified in Invest Almaz's proposed jury instructions, final pretrial statement, or opening argument at trial. Even when Invest Almaz finally asserted the claims at the close of plaintiff's evidence, it did not do so directly. Instead, Invest Almaz incorporated the claims into its opposition to Temple-Inland's motion for judgment as a matter of law, accusing Temple-Inland of "misreading Invest Almaz's theory of the case" by "ignoring" the affirmative misrepresentation claims.

At the hearing on its motion, Temple-Inland commented that the claims had never been pleaded, even though, under the Rules, they needed to be pleaded "with some specificity." Temple-Inland did not, however, expressly contend that the inclusion of the claims would be prejudicial. Invest Almaz, for its part, did not dispute that the claims were being raised for the first time. However, it argued that all it was requesting was amendment of the pleadings to conform to the evidence already introduced. Invest Almaz contended that doing so would not

prejudice Temple-Inland because the affirmative fraud claims largely tracked the concealment claims.

At the conclusion of the hearing, the magistrate judge denied Invest Almaz's request to add the affirmative fraud claims to the case, holding that their last minute inclusion would be prejudicial to Temple-Inland "in view of the very special fraud pleading requirements of [Fed. R. Civ. P.] Rule 9." The magistrate judge did not refer to specific evidence of prejudice, other than the "untimeliness" of the effort to amend.[18] On appeal, Invest Almaz argues that it should have been allowed to amend its pleadings to include the affirmative fraud count, in view of the liberal policies governing amendments to conform pleadings to the evidence contained in Fed. R. Civ. P. 15(b) and the magistrate judge's failure to cite evidence that Temple-Inland would be prejudiced by the amendment. Temple-Inland responds that Invest Almaz failed to move to amend its pleadings below, thus waiving this argument, or, in the alternative, that Temple-Inland is entitled to judgment as a matter of law on the merits of the affirmative fraud claims.

---

[18] The magistrate judge also stated that, in his view, omitting the claims would not prejudice Invest Almaz, because the alleged affirmative misstatements could equally be construed as actionable partial disclosures.

-32-

As a threshold matter, we find Temple-Inland's argument that Invest Almaz failed to preserve the issue of amendment of its pleadings unpersuasive. Although Invest Almaz chose to broach its affirmative fraud claims for the first time in its opposition to Temple-Inland's motion, Invest Almaz's counsel clearly indicated at the hearing that it wished to amend the pleadings if the magistrate judge thought it necessary. In addition, the magistrate judge himself framed his decision as a denial of Invest Almaz's request for leave to amend. Invest Almaz's appeal of the denial of leave to amend is therefore properly before us.[19]

We turn to the merits of Invest Almaz's argument guided by the following principles. "While leave to amend shall be freely given when justice so requires . . . the liberal amendment

_____

[19] Although it does not change our conclusion, we note that Invest Almaz's characterization of what the magistrate judge did is not, strictly speaking, correct. Invest Almaz plainly believes it requested -- and was improperly denied -- leave to amend its pleadings to conform with the evidence pursuant to Fed. R. Civ. P. 15(b). However, Rule 15(b) applies under only two circumstances: when an issue not contained in the pleadings is tried by consent (express or implied) of the parties, or when a party objects to evidence as outside the pleadings and the court exercises its discretionary right to allow amendment. Neither circumstance is present here, indicating that the magistrate judge's decision actually was rendered pursuant to Fed. R. Civ. P. 15(a). Because the arguments made by Invest Almaz are also relevant in the context of Fed. R. Civ. P. 15(a), this error is not fatal to Invest Almaz's appeal on this issue.

policy prescribed by Rule 15(a) does not mean that leave will be granted in all cases." Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 51 (1st Cir. 1998) (internal citations and quotation marks omitted). "Among the adequate reasons for denying leave to amend are 'undue delay' in filing the motion and 'undue prejudice to the opposing party' by virtue of allowance of the motion." Id. (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). Furthermore, "when considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some valid reason for his neglect and delay." Acosta-Mestre, 156 F.3d at 52 (quoting Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d 922, 933 (1st Cir. 1983)) (internal quotation marks omitted). We also note that, in reviewing a decision denying leave to amend, we accord significant deference to the decisionmaker below. Denial of leave to amend is reviewed only for abuse of discretion, and we will affirm the decision below "if any adequate reason for the denial is apparent on the record." Acosta-Mestre, 156 F.3d at 51 (quoting Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995)).

We find that the magistrate judge's refusal to allow amendment withstands Invest Almaz's challenge. We concede that the magistrate judge's finding of prejudice could have been

accompanied by a clearer explanation of its grounds than was given.[20] Nonetheless, we think the record adequate to sustain the magistrate judge's conclusion. The fact that the theory underlying the affirmative fraud counts had yet to be more than obliquely mentioned, moments before Temple-Inland was scheduled to begin presenting its case, certainly supports an inference of prejudice to Temple-Inland's defense. The inference seems particularly strong here, given that some of Temple-Inland's testimony -- including the important testimony of Charles Kosa, former president of Pathex and Temple-Inland's first witness -- was to be presented via videotaped deposition. Under the circumstances, Temple-Inland had a limited ability to adapt its defense on short order to counter Invest Almaz's new claims.

In addition, there is nothing in the record suggesting that Invest Almaz met its burden of showing a "valid reason for [its] neglect and delay" in proposing the amendment. Acosta-

---

[20] Indeed, it is possible to read the transcript to suggest that, because of the pleading requirements for fraud claims imposed by Fed. R. Civ. P. 9, the magistrate judge simply presumed that prejudice to Temple-Inland would result from Invest Almaz's late inclusion of such claims. We do not believe that any court has used Rule 9 to raise the Rule 15(a) bar in this way and we are not inclined to do so now. Cf. 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1300 & n.1 (2d ed. 1990) (stating that "[a]n insufficient allegation of fraud or mistake is subject to the liberal amendment provisions of Rule 15" and citing numerous cases allowing amendments to cure insufficient fraud pleadings).

<u>Mestre</u>, 156 F.3d at 52.  To the contrary, Invest Almaz's counsel admitted at the hearing on Temple-Inland's motion that the affirmative fraud claims were raised at this late stage simply because it hadn't occurred to Invest Almaz to add them earlier. As we recently said, "[w]hat the plaintiff knew or should have known and what he did or should have done are relevant to the question of whether justice requires leave to amend under this discretionary provision."  <u>Leonard</u> v. <u>Parry</u>, 219 F.3d 25, 30 (1st Cir. 2000).  Such considerations counsel against amendment here.

> 2.    <u>Judgment as a Matter of Law on Fraudulent Concealment Count</u>

Invest Almaz's second amended complaint alleged that Temple-Inland fraudulently failed to disclose a substantial number of material facts regarding the plant.  The alleged omissions fell into three broad categories: omissions regarding the monetary value of the plant (dubbed by the magistrate judge the "value" claims); omissions regarding alleged obsolescence of the plant's equipment (the "obsolescence" claims); and omissions regarding environmental problems at the plant (the "environmental" claims).  Consistent with the elements of fraudulent concealment, Invest Almaz alleged, with respect to each omission: that the information was material; that Temple-Inland intentionally concealed the information despite having a duty to disclose it; that Invest Almaz reasonably relied upon the

omissions; and that Invest Almaz was damaged as a result. See MAC Fin. Plan of Nashua, Inc. v. Stone, 214 A.2d 878, 880 (N.H. 1965) (summarizing the elements of fraudulent concealment); see also Batchelder v. Northern Fire Lites, Inc., 630 F. Supp. 1115, 1118 (D.N.H. 1986) (discussing, in a case applying New Hampshire law, the requirement that there be a duty to disclose and citing cases).

At the close of Invest Almaz's case, Temple-Inland moved for judgment as a matter of law with respect to all of Invest Almaz's fraud claims. Following a hearing, the magistrate judge granted the motion, concluding, for each category of allegations, that Invest Almaz had failed to introduce evidence sufficient to establish that Temple-Inland had intentionally concealed the information in question:

> [W]ith regard to the environmental claims there were -- the evidence is that there were substantial negotiations as to who is to be responsible for what. That in fact Pathex was given and ultimately Invest Almaz was given unfettered access to the plant and to the property with the full ability to observe, to test. The fact that Aries [the environmental consultant hired by Pathex] was late with regard to its test was because they didn't get in and do the test before the snow fell and they themselves asked for an extension; in other words, there was no intentional concealment.
>
> With regard to obsolescence, no reasonable jury could determine that there was an intentional concealment of the obsolescence

-37-

where in fact there was a full right by Pathex, which was in the equipment business, to thoroughly inspect, nor even with respect to Invest Almaz, where Invest Almaz sent two engineers to inspect the equipment.

With regard to the value issue, there is no evidence from which a reasonable jury could determine that there was an intentional concealment of value, particularly with respect to all of the allegations of value, vis-a-vis the Town of Claremont, the court takes judicial notice of the fact that all of those documents were public documents on record in the Town of Claremont Tax Assessor's office open to everyone in the public. They were specifically referenced in Exhibit Y [the appraisal prepared for Pathex in December 1993]. And in fact there was no evidence that the defendant ever represented any value to Pathex or to Invest Almaz. They simply negotiated a sales price.

On appeal, Invest Almaz argues, unsurprisingly, that it introduced sufficient evidence with respect to each element of fraudulent concealment, and each category of omission, that a reasonable jury could have found in its favor; therefore, the magistrate judge erred in granting judgment as a matter of law for Temple-Inland. In addition, Invest Almaz argues that the magistrate judge's analysis must be rejected because it proceeds from a legal error: the magistrate judge assumed, for purposes of his analysis, that any knowledge obtained from Temple-Inland by Pathex was chargeable to Invest Almaz. Invest Almaz contends that it is not chargeable with such knowledge under New Hampshire agency law because Pathex was a "faithless agent." Temple-

-38-

Inland, in turn, argues that Invest Almaz's faithless-agent defense does not apply to this case and that the magistrate judge was correct in concluding that no reasonable jury could find in Invest Almaz's favor on the fraud claims. Because the applicability of the faithless-agent defense is critical to our review of the evidence, we address it first.

### a. Invest Almaz's Faithless-Agent Defense

Invest Almaz's argument that a principal is not chargeable with knowledge obtained by a "faithless agent" relies on <u>Boucouvalas</u> v. <u>John Hancock Mut. Life Ins. Co.</u>, 5 A.2d 721 (N.H. 1939). In <u>Boucouvalas</u>, the defendant insurer sought to be relieved of its obligations under a life insurance policy procured through the fraud of its agent. The agent, in completing paperwork for an illiterate applicant, had deliberately omitted information the applicant provided concerning a serious illness. When the applicant died shortly thereafter from the same illness, the insurer argued that it was not chargeable with knowledge of the plaintiff's illness and therefore not bound by the policy.

The New Hampshire Supreme Court ruled for the defendant, reversing an earlier decision, <u>Domocaris</u> v. <u>Ins. Co.</u>, 123 A. 220 (N.H. 1923), which had held that an insurer <u>was</u> chargeable with knowledge of a deceitful agent. In its decision,

the Boucouvalas court cited back to pre-Domocaris precedent holding that "the principal is not charged with the knowledge of his agent when the latter is engaged in committing an independent, fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act." Brookhouse v. Union Publ'g Co., 62 A. 219, 222 (N.H. 1905); see also Warren v. Hayes, 68 A. 193, 194 (N.H. 1907) ("The test, therefore, to determine whether an agent's knowledge is to be imputed to his principal is to inquire whether or not the agent was acting for the principal when he did that in respect to which is sought to charge the principal with his knowledge."). The court acknowledged that there was no evidence of wrongdoing by the applicant, but nonetheless concluded that he (or, in this case, his beneficiary) was entitled to no more than a refund of premiums paid. See Boucouvalas, 5 A.2d at 724.

Although Boucouvalas has never been overruled, and has been followed on at least one occasion, see LeClerc v. Prudential Ins. Co. of Am., 39 A.2d 763 (N.H. 1944), we harbor some doubt concerning its vitality and applicability to this case. In the majority of jurisdictions, the law has evolved towards a recognition that information given to even a fraudulent agent should normally be imputed to the principal, unless the third party providing the information has notice that the agent is

acting adversely or otherwise colludes with the faithless agent. See B. H. Glenn, Insured's Responsibility for False Answers Inserted by Insurer's Agent in Application Following Correct Answers by Insured, or Incorrect Answers Suggested by Agent, 26 A.L.R.3d 6, 33-45 (1969 & Supp. 2000) (showing state courts to be virtually unanimous in holding that knowledge of an insurance agent will be imputed to insurer, despite fraud of agent, unless the applicant has notice of the fraud); see also Restatement (Second) of Agency § 282, cmt. d (adopting the same position as a general principle of agency law). While the New Hampshire Supreme Court has not yet formally adopted this view, it has expressed clear misgivings about Boucouvalas. See Mut. Benefit Life Ins. v. Gruette, 529 A.2d 870, 872-73 (N.H. 1987) (conceding that the Boucouvalas rule "acts harshly as to [those] who fall prey to devious agents" and noting public policy reasons supporting its reversal, but concluding that factual circumstances of the case -- including evidence of collusion between the applicant and agent -- "[did] not furnish an appropriate basis for returning to the rule of Domocaris"); see also Perkins v. John Hancock Mut. Life Ins. Co., 128 A.2d 207, 208 (N.H. 1956) (questioning whether, in light of Boucouvalas, New Hampshire insurance law "permits the issuance of a policy to bind the insurer to the extent that reasonable person in the

position of the insured would understand that it did" but concluding that the problem was more properly resolved by the legislature); Taylor v. Metro. Life Ins. Co., 214 A.2d 109, 113 (N.H. 1965) (same). It also appears that Boucouvalas has been limited to its facts by the New Hampshire Supreme Court: although the pre-Domocaris cases to which Boucouvalas refers involved a range of factual circumstances, we find no subsequent case applying the rule except in the context of duplicitous insurance agents.

Nonetheless, given our obligation in diversity cases to "determine the rule that the state Supreme Court would probably follow," Moores v. Greenberg, 834 F.2d 1105, 1107 n.3 (1st Cir. 1987) (internal punctuation marks omitted), we find these doubts to be insufficient grounds for ruling that Boucouvalas is either invalid or inapplicable. The New Hampshire Supreme Court has not seen fit to overrule Boucouvalas, and we cannot reasonably assume that it would do so now, if it faced the issue directly. In addition, we find support for Boucouvalas' holding and its applicability to the present facts in New Hampshire's Uniform Partnership Act ("UPA"), which states, in pertinent part:

> Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner . . . operates as notice to or knowledge of the partnership, except in the case of a fraud on the

> partnership committed by or with the consent
> of that partner.

N.H. Rev. Stat. Ann. § 304-A:12 (emphasis added).[21] The New Hampshire Supreme Court looks to state partnership law in deciding cases involving joint ventures. Miami Subs Corp. v. Murray Family Trust, 703 A.2d 1366, 1370 (N.H. 1997). Although this provision of the UPA has not been given an authoritative reading by the New Hampshire Supreme Court, we find its plain language sufficiently persuasive to outweigh our doubts concerning the applicability of the rule of Boucouvalas.

Having accepted that Invest Almaz's "faithless agent" defense is available as a matter of New Hampshire law, we still must determine whether there is sufficient evidence that Pathex was engaged in a fraud against Invest Almaz to justify its application here. Unlike Invest Almaz, we do not consider the issue free from dispute. While the Pathex former president, Charles Kosa, admitted that information regarding the plant was not conveyed to Invest Almaz, Kosa suggested that this occurred

---

[21] In its brief, Temple-Inland points us to a second provision of the UPA which could be read to take a different view. This provision states in substance that each partner will be considered an agent of the partnership whose acts bind the partnership, unless the partner lacks authority for the act in question "and the person with whom [the partner] is dealing has knowledge of the fact that he has no authority." N.H. Rev. Stat. Ann. § 304-A:9. We think it clear that section 304-A:12, which specifically concerns the imputation of knowledge to a partnership, governs here.

because Pathex believed the joint venture agreement assigned it primary responsibility for selecting, purchasing and preparing a suitable plant.  Nonetheless, we think enough evidence was introduced to permit a reasonable jury to find that Pathex intentionally withheld the information as part of an effort to conceal from Invest Almaz the condition and value of the facility.  Therefore, for purposes of Temple-Inland's motion for judgment as a matter of law, Invest Almaz should not have been charged with knowledge of information that was never revealed to it by Pathex.

    b.  <u>Judgment as a Matter of Law</u>

   Although we find that Invest Almaz was entitled to the benefit of its faithless-agent defense for purposes of the Fed. R. Civ. P. 50(a) motion, this result is not conclusive on the question of whether Temple-Inland was entitled to judgment as a matter of law.  As we read it, the magistrate judge's ruling rested on two distinct grounds: first, that Temple-Inland's grants of access to Pathex and/or Invest Almaz to inspect and conduct tests negate any reasonable inference of fraudulent intent; and, second, that the availability of certain information to Pathex or Invest Almaz negates the inference that there was

ultimately any concealment.[22]  Invest Almaz's faithless-agent

defense plainly weakens the second rationale, but it does not

affect the first.  Nor are we limited to upholding the magistrate

judge's conclusion only for the reasons actually invoked in his

ruling.  E.g., Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 172

(1st Cir. 1998) (noting, in the summary judgment context, that

this court "[w]ill affirm a correct result reached by the court

below on any independently sufficient ground made manifest by the

record"); Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 80 (1st

Cir. 1999) (applying the same rule in reviewing  a grant of

judgment as a matter of law).  We therefore proceed to the merits

of Temple-Inland's Rule 50(a) motion.

We review a grant of judgment as a matter of law de

novo, "under the same standards as the district court."  Katz v.

City Metal Co., 87 F.3d 26, 28 (1st Cir. 1996).  In so doing, we

"examine the evidence and all fair inferences in the light most

favorable to the plaintiff and may not consider the credibility

of witnesses, resolve conflicts in testimony, or evaluate the

---

[22]    While the language of the magistrate judge's ruling
suggests that he viewed this evidence as undercutting
"concealment," our reading of New Hampshire precedent suggests
that it might more properly be viewed as undermining Invest
Almaz's ability to claim justifiable reliance.  Cf. Cross v.
Lake, 441 A.2d 1179, 1180 (N.H. 1982) (holding that a buyer's
knowledge of the "true state of affairs" precluded the buyer
from claiming that he relied on seller's misrepresentations
concerning the acreage of a property offered for sale).

weight of the evidence." Id. (quoting Richmond Steel, Inc. v. P.R. Am. Ins. Co., 954 F.2d 19, 22 (1st Cir. 1992)) (internal punctuation marks omitted). At the same time, it remains the responsibility of the party with the burden of proof to present "more than a mere scintilla" of evidence in its favor; and to do more than "rely on conjecture or speculation" in support of its position. Katz, 87 F.3d at 28. To the contrary, "[t]he evidence offered must make the existence of the fact to be inferred more probable than its nonexistence." Id. (quoting Resare v. Raytheon Co., 981 F.2d 32, 34 (1st Cir. 1992)). We also bear in mind the plaintiff's burden of proof at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."). New Hampshire common law provides that fraud must be proved by "clear and convincing proof" and "will not be implied from doubtful circumstances." Sheris v. Thompson, 295 A.2d 268, 271 (N.H. 1971); accord Snow v. Am. Morgan Horse Ass'n, Inc., 686 A.2d 1168, 1170 (N.H. 1997). Ultimately, we will affirm the magistrate judge's ruling if we find that "as a matter of law, the record would permit a reasonable jury to reach only one conclusion as to that issue." Katz, 87 F.3d at 28.

-46-

Because our analysis differs with respect to each category of allegedly concealed information, we treat them separately, employing, for simplicity, the magistrate judge's labels.

   i.   Value

Invest Almaz's complaint alleges that Temple-Inland fraudulently concealed three specific facts regarding the plant's value: the "book value" of the Claremont OSB plant (carried in Temple-Inland's internal records as $2.4 million); the fair market value of the plant (calculated by Temple-Inland for tax assessment purposes as $1.6 million); and the "fact" that Temple-Inland could not have realized $5 million on a sale of the equipment at auction.

We think that the trial record provided an adequate basis from which a reasonable jury could have concluded that the alleged "facts" were true and known to Temple-Inland, were not disclosed by Temple-Inland to either Pathex[23] or Invest Almaz, and were material to Invest Almaz. However, we find that Invest Almaz has presented no legally sufficient grounds for concluding that

_____

[23]   Pathex eventually learned at least the market value through its independent appraisal, a fact on which the magistrate judge apparently relied in determining that there was no concealment. However, there is no evidence that Pathex passed the information up to Invest Almaz and, because of our conclusion on the agency issue, we do not charge Invest Almaz with this knowledge.

Temple-Inland was under any duty to reveal the information in question.

In New Hampshire, as elsewhere, liability for fraudulent concealment does not arise in the absence of a duty of disclosure. <u>Batchelder</u>, 630 F. Supp. at 1118 ("[F]or a failure to disclose to be actionable fraud, there must be a duty arising from the relation of the parties to so disclose."); <u>Benoit</u> v. <u>Perkins</u>, 104 A. 254, 256 (N.H. 1918) ("[T]he fraudulent concealment of known facts with intent to mislead, and which in fact does mislead, . . . does not constitute actionable fraud, unless there be some obligation which the law recognizes to disclose the facts concealed."); <u>see</u> <u>also</u> <u>Restatement (Second) of Torts</u> § 551(1). Invest Almaz does not dispute this, but instead argues that, under the circumstances of this case, Temple-Inland acquired such a duty. Invest Almaz's first rationale is that Temple-Inland's invitation to representatives of the Russian company to tour the plant, accompanied by the offer to answer "any questions," by itself gave rise to an obligation fully to disclose information regarding the condition and value of the plant. However, Invest Almaz provides no support for this curious contention. Nor are we aware of any cases suggesting that, simply by inviting a prospective purchaser to tour a

-48-

property, a seller assumes an obligation to volunteer its own views as to the property's value.

Invest Almaz's second contention is that Temple-Inland made "partial disclosures" concerning value which gave rise to a duty of full disclosure. Of the examples of such statements offered, only one merits discussion.[24] At trial, Invest Almaz played a videotaped deposition of Invest Almaz's president, Yurij Zepavalov. Zepavalov testified that Viktor Tikhov – one of the Invest Almaz engineers who toured the plant -- told Zepavalov that he had asked tour guide Earl Taylor about the price of the plant, but Taylor provided "no response" and, instead, "evaded the question." Although plainly hearsay, this statement apparently entered the record because Temple-Inland's counsel failed to object at the appropriate time.

Assuming, without deciding, that this statement is appropriately part of the record for purposes of our review, we

---

[24] The other examples of "partial disclosures" offered -- Temple-Inland's alleged descriptions of the plant as in "good condition" and "well maintained" -- are frivolous. We do not believe that such statements could reasonably be seen as indicative of value and, therefore, could not create a duty of further disclosure. Furthermore, these statements are exactly the kind of "loose general statements made by sellers in commending their wares" upon which purchasers are not entitled to rely. Restatement (Second) of Torts § 542, cmt e; accord Sipola v. Winship, 66 A. 962, 966 (1907) (noting that purchasers are not entitled to rely on "mere general commendations or expressions of opinion" made by a seller).

think it insufficient to support a finding that Temple-Inland acquired a duty of disclosure with respect to value. Invest Almaz points to no case, and we are aware of none, suggesting that merely not answering a question, without more, creates a duty of disclosure.[25] While there is precedent in New Hampshire case law for the proposition that a vendor offering a deceptive opinion as to value may be liable in fraud, nothing in the deposition testimony indicates that Taylor gave an opinion of value,[26] or, indeed, even knew the sale price of the plant. Compare Shafmaster v. Shafmaster, 642 A.2d 1361, 1364 (N.H. 1994) (holding that a defendant's inclusion of incorrect opinions of value in a financial statement submitted as part of divorce proceeding was fraudulent). We therefore conclude that Temple-Inland had no duty to disclose the information respecting value it is charged with concealing and that judgment as a matter of law was appropriate with respect to these allegations.

---

[25] We acknowledge that there are circumstances in which silence could be deceptive, as, for example, when the party asking the question states its own understanding as to a fact and the respondent's silence could be taken as assent. Nothing in the deposition testimony suggests that Tikhov understood Taylor's response, whatever it actually was, to contain any such implication.

[26] In this context, we note that the jury also heard the videotaped deposition of Vladimir Semkin, the other Invest Almaz engineer on the tour. Semkin stated that he inquired as to the price of the equipment of Taylor, and Taylor responded that he "had no information about that."

ii.    Obsolescence

Seven of Invest Almaz's allegations of concealment relate to the "obsolescence" issue.  According to Invest Almaz, Temple-Inland improperly failed to reveal that the plant was "not capable of manufacturing OSB above cost in the current or foreseeable market"; the plant was "economically and functionally obsolete"; the plant was closed because it lost money; the plant was "one of the oldest OSB lines in America"; the plant was characterized by Temple-Inland's CEO as "economically not viable"; the prior owner of the plant had gone bankrupt; and Temple-Inland "knew as early as 1990" that the plant would "never make money."

We have some doubt as to whether all seven of these allegations were seriously advanced below or are meaningfully pressed on appeal.  Nor do we think that Invest Almaz's evidence supports the full breadth of these allegations.  However, we find evidence in the record from which a reasonable jury could infer the truth of what we take to be the core of these allegations: that Temple-Inland's Claremont plant was old and, at least in its current location and configuration, unable to make a profit;[27]

_____

[27]    Several pieces of evidence indicated that the plant's ability to upgrade to compete was limited by the size of the existing buildings and the site on which it was located.  No evidence was introduced concerning the equipment's ability to operate profitably in any other location.

that its unprofitability was due in part to long-term changes in the regulatory regime and market in which it operated, including competition from newer, larger OSB plants able to operate with lower costs; and that Temple-Inland closed the plant because it was losing money.

Invest Almaz also introduced evidence generally tending to show that information of this kind was not revealed to Pathex or Invest Almaz by Temple-Inland.[28] However, on this point Invest Almaz's position was contradicted in part by an admission by Vladimir Semkin. In his videotaped deposition, Semkin testified that he was told by Earl Taylor that the plant was closed because it was "loss-making" and "could not make a profit," a fact that Taylor allegedly attributed to increases in the price of obtaining timber. In addition, the record indicates that Taylor in fact told the Russian engineers that the plant began operation in 1981.[29]

---

[28] Here, again, it is clear that Pathex eventually obtained much of this information through its appraisal, but there is no evidence that Pathex reported it to Invest Almaz.

[29] This fact appears in notes taken by Invest Almaz engineer Tikhov during the tour on Tikhov's copies of written materials distributed by Taylor at that time. These materials, including the notes, were introduced during plaintiff's case, although the translation of Tikhov's notes was not placed in evidence until after Invest Almaz rested its case.

To establish the materiality of the concealed information, Invest Almaz introduced videotaped testimony of president Zapevalov. Zapevalov's testimony with respect to the materiality of the plant's alleged obsolescence, however, was not particularly helpful to Invest Almaz, as the following colloquy indicates:

> Q.   Were you ever told that production costs at the plant had exceeded the market price for the product?
>
> A.   No, I was never been told [sic] that.
>
> Q.   And when your representatives visited the plant in October 1993 were they told that?
>
> A.   No, they were not told that, <u>but you have to bear in mind that the production cost in the United States can differ from that in Russia</u>, but nevertheless nobody told us about the production price and the fair market value of the product.
>
> Q.   If you had been informed of those facts, would it have made a difference to you?
>
> A.   <u>For us the most important is the production cost in Russian conditions, not in the United States, because we paid [sic] differently for electricity, for everything which comprises the production cost.</u>

Zapevalov Dep. p. 50-51(emphasis added). No other testimony was introduced directly bearing on the materiality of the plant's

-53-

obsolescence to Invest Almaz, although there was witness testimony and documentary evidence concerning the performance expectations Invest Almaz had for the rebuilt, relocated plant.

For the reasons discussed with respect to Invest Almaz's value claims, we do not think that Temple-Inland was under any general duty to disclose the information regarding obsolescence that Invest Almaz claims was concealed. It is apparent from Invest Almaz's allegations, and, indeed, conceded in Invest Almaz's brief, that the term "obsolescence" is meant to refer only to the alleged inability of the equipment to produce OSB profitably, not to any defects affecting its operation. See Pl's. Br. at 48 ("The equipment was not obsolete in the sense that it did not work; it was obsolete in the sense that it was economically inefficient and could not make OSB at a competitive price."). Furthermore, as Invest Almaz's evidence regarding obsolescence indicates, the unprofitability of the plant was the result of circumstances -- such as increased energy and pollution control costs and the development of larger, more cost-effective plants -- external to the equipment itself. Invest Almaz has identified no precedent, and we are aware of none, obligating a seller as a general matter to reveal this kind of information, which appears relevant primarily to the suitability of the equipment for purposes and under conditions about which Invest

-54-

Almaz plainly had superior knowledge.  Such a duty seems particularly inappropriate here, where it was understood that the equipment would be put into operation only after extensive modification.

Invest Almaz has a stronger case that a limited duty of disclosure arose as a result of Taylor's alleged comments to the effect that high timber costs made the plant unprofitable.  As noted above, the evidence at trial pointed to several other reasons why the plant could not make money.  Given this, Taylor's statements could be construed as a "partial disclosure" requiring further clarification concerning the reasons why the plant closed.  See, e.g., Dawe v. Am. Univ. Ins. Co., 417 A.2d 2, 4 (N.H. 1980) ("[P]artial disclosure may give rise to a duty to fully disclose when the partial disclosure, standing alone, is deceptive.").

Ultimately, however, we do not think that this line of argument could have succeeded.  First, it is not clear that Invest Almaz actually contends on appeal that Temple-Inland's duty to disclose obsolescence arose in this way.[30]  Instead, Invest Almaz appears to rely on the same general grounds already considered and rejected as creating any duty of disclosure with

_____

[30]    It seems somewhat clearer that Invest Almaz did raise this argument in its opposition to Temple-Inland's motion for judgment as a matter of law.

-55-

respect to the "value" allegations. We consider it telling that Invest Almaz introduced no evidence in its affirmative case indicating that the information Taylor gave was actually false, that Taylor intended to

mislead the Russian representatives by his statement, or that anyone else at Temple-Inland knew what Taylor told Invest Almaz.[31]

In addition, we do not believe that a reasonable jury could find on this record "clear and convincing" evidence that the information Temple-Inland arguably came under a duty to disclose was material to Invest Almaz. As Zepavalov's deposition testimony plainly states, Invest Almaz's concern was with the ability of the equipment to operate profitably in its new location. Yet none of the reasons for the plant's unprofitability introduced as part of Invest Almaz's case are ultimately germane to that question. Zepavalov specifically acknowledges that the costs of production, which were the primary reasons for the plant's unprofitability in the United States, would be completely different in Russia. It is also far from self-evident that, in Russia, the plant would be directly

---

[31] This is particularly surprising because Taylor was later called as a witness for Temple-Inland and Invest Almaz's counsel cross-examined him at some length about the possibility that he might have been biased in the information he gave Invest Almaz. Had Invest Almaz wanted to put Taylor's intention at issue, we think it would not have rested its own case without attempting to develop this testimony.

competing with the same kinds of higher-volume facilities apparently dominating the North American market.[32] Invest Almaz introduced no evidence suggesting that parallels could be drawn between Russian and North American conditions, nor did it introduce any other evidence from which it could be inferred that the equipment could not be operated at a profit in Russia, or that it could not be rebuilt to meet the standards called for in the joint- venture agreement. Absent such evidence, we think any argument that the improperly concealed information was material to Invest Almaz would rest on sheer speculation.

For the foregoing reasons, we think judgment as a matter of law was appropriately granted with respect to the obsolescence allegations.

### iii.    Environmental Problems

Invest Almaz's final allegation of fraud asserts that Temple-Inland concealed "significant environmental problems at the plant, including the presence of hazardous and non-hazardous waste, chemical pollution, and radioactive material." Like the magistrate judge, who characterized the environmental issue as a "red herring," we view this allegation with particular skepticism. While there were clearly environmental problems at

---

[32]    In fact, Zepavalov testified that, at least in 1993, there were no OSB plants operating in all of Russia.

-57-

the plant -- including both historical noncompliance with environmental regulations and present contamination of site soils and sediments -- we find it hard to discern how those problems were relevant to the equipment purchase Invest Almaz hoped to accomplish.[33]  Invest Almaz does not appear to argue that the equipment itself was contaminated.  Nor does Invest Almaz point to evidence suggesting that the plant was incapable of being operated in a non-polluting manner.  Indeed, as we read the record, the environmental issues were only evaluated so that Pathex could decide whether or not to purchase the property on which the plant was built, an aspect of the transaction unrelated to the joint venture's purposes.

Furthermore, we think that the magistrate judge was plainly correct in concluding that, in view of the extensive interactions between Pathex and Temple-Inland regarding the environmental issues, no reasonable jury could find that Temple-Inland intentionally concealed environmental information in order

---

[33]    We acknowledge that Invest Almaz president Zepavalov testified in his deposition that the environmental problems at the plant would have been of importance to him.  However, this does not automatically establish the materiality of this information as a matter of law.  If it were objectively unreasonable for Zepavalov to consider such information "in determining his choice of action in the transaction," Restatement (Second) of Torts § 538(1)(a), materiality would require a showing that Temple-Inland knew, or had reason to know, that Zepavalov nonetheless viewed the information as critical to his decision, id. § 538(1)(b).

to defraud either Pathex or Invest Almaz.  See Hall v. Merrimack Mut. Fire Ins. Co., 13 A.2d 157, 160 (N.H. 1940) (fraud requires a "deliberate falsehood . . . made for the purpose or with the intention of causing the other party to act upon it").  Uncontradicted evidence in the record shows that the existence of environmental problems at the facility and the parties' respective obligations for analyzing and resolving those problems were discussed throughout the negotiations between Pathex and Temple-Inland, beginning, at latest, by mid-July 1993 -- before Pathex entered into the option agreement with Temple-Inland and well before Invest Almaz signed the joint-venture agreement.  It is also beyond dispute that Pathex fully understood the importance of undertaking its own environmental assessment to determine the full scope of the environmental problems at the plant,[34] and there is no evidence that Temple-Inland sought to impede the assessments performed for Pathex by Aries.[35] Furthermore, the record indicates that Pathex and Temple-Inland

---

[34]  In fact, Invest Almaz's attorney elicited uncontradicted testimony from Temple-Inland General Counsel Vorpahl indicating that responsibility for environmental investigation was a critical component of the successive drafts of the option agreement and Asset Purchase Agreement, and that Temple-Inland took the position throughout that Pathex should make an independent investigation.

[35]  To the contrary, the contents of the assessments make clear that Earl Taylor, at least, provided significant information to Aries.

-59-

continued to discuss the results of these environmental surveys, the progress of Temple-Inland's cleanup efforts, and the impact of environmental issues on the final shape of the Asset Purchase Agreement, throughout the option period. In our view, this uncontradicted evidence of extensive, ongoing discussions regarding environmental matters, begun before any agreement was signed and culminating in an unfettered opportunity to discover the true state of affairs prior to purchasing the property, precludes any reasonable jury from finding that Temple-Inland intentionally concealed any environmental problems the plant may have had.[36]

Invest Almaz's arguments against this result are unpersuasive. Invest Almaz first suggests that giving Pathex notice of the environmental problems and the opportunity to learn more was not sufficient to avert a finding of fraudulent concealment. Instead, Invest Almaz argues, Temple-Inland was obliged to disclose the full environmental history of the plant

---

[36] We acknowledge that Invest Almaz sought to develop, and to some minor extent succeeded in developing, evidence to the effect that Temple-Inland may have had a motive to "cut corners and shade the truth in order to sell." For example, Invest Almaz elicited testimony indicating that Temple-Inland was incurring substantial carrying costs on the facility. In the face of the overwhelming evidence indicating that Temple-Inland did reveal the existence of environmental problems at the plant, we do not think Invest Almaz's circumstantial and speculative evidence of a possible "motive" creates a trialworthy dispute concerning Temple-Inland's intent.

and to do so from the outset. Invest Almaz offers no precedential support for this proposition, which strikes us as wholly at odds with established business practice. While we can certainly imagine circumstances in which notice and an opportunity to inspect would be inadequate -- as when the party providing notice intentionally misdirects the other party or prevents it from completing an investigation, see Bergeron v. Dupont, 359 A.2d 627, 629 (N.H. 1976) (plaintiff's own investigation not a defense to misrepresentation when the investigation was restricted by bad weather and by defendant's request that it be curtailed) -- we think it more generally the case that accepting such an opportunity prevents a party from later claiming that it acted in reliance on an adverse party's representations. See Restatement (Second) of Torts § 547(1) ("[T]he maker of a fraudulent misrepresentation is not liable to another whose decision to engage in the transaction that the representation was intended to induce . . . is the result of an independent investigation by him."); see also Sipola, 66 A. at 966 (noting that, although there is generally no duty of purchaser to investigate the truthfulness of representations made

by a seller, such a duty arises when the purchaser has "knowledge of his own, or of any facts which would excite suspicion").[37]

Invest Almaz's second argument is that, notwithstanding Temple-Inland's above-board dealings with respect to Pathex, Temple-Inland remains liable vis á vis Invest Almaz, because it failed to disclose the environmental problems at the plant <u>during the tour</u> and Invest Almaz relied on that omission to its detriment by signing the joint-venture agreement. Under this theory, Temple-Inland's disclosures to Pathex are not evidence of Temple-Inland's lack of fraudulent intent, because Temple-Inland was engaged in a separate fraud against Invest Almaz specifically. The problem with this contention is that it presumes a degree of coordination between Pathex and Temple-Inland for which there is simply no evidence. To conclude that Temple-Inland intentionally defrauded Invest Almaz alone, a jury would seemingly have to find that Temple-Inland withheld the environmental information knowing that Pathex also had not and would not reveal it; knowing that Invest Almaz was about to sign

---

[37] Also relevant in this context is the fact that both parties were experienced business entities, clearly having the capacity to evaluate the information available to them. <u>See</u> <u>Smith</u> v. <u>Pope</u>, 176 A.2d 321, 324 (N.H. 1961) (noting that, in determining "whether the plaintiffs were justified in accepting the defendant's statements at face value" the court applies "an individual standard, based upon [the plaintiffs'] own capacity and knowledge").

a deal committing itself to this plant (although the option clock still had time to run); and expecting and intending that Invest Almaz would rely on these omissions. Although Invest Almaz's briefs assert that such collusion occurred, the evidence presented at trial does not begin to support this elaborate chain of inferences.

Indeed, we think it questionable whether a reasonable jury could conclude that Temple-Inland even withheld the existence of environmental concerns from Invest Almaz during the tour. The packet of written information given to Invest Almaz's representatives by Earl Taylor specifically mentions that the plant equipment includes gauges containing radioactive materials; that the plant used phenol formaldehyde as a binder; and that Temple-Inland contracted with an entity named Jet Line for environmental services relating to hazardous waste, oil in the ponds and drums of waste at the facility. This information would appear sufficient to put Invest Almaz on notice and therefore to defeat any claim of reliance. See Sipola, 66 A. at 966. At the very least, we consider the fact that Taylor handed out this information fatal to any argument that Temple-Inland intended to conceal the plant's environmental problems during the tour.

Given the foregoing, we conclude that judgment as a matter of law was properly granted with respect to this final group of allegations of fraudulent concealment.

C.        Aiding and Abetting

Invest Almaz's final claim of error concerns the instructions given the jury with respect to the knowledge element of the tort of aiding and abetting a breach of fiduciary duty. The magistrate judge, following the majority of jurisdictions recognizing this tort, concluded that Invest Almaz had to prove that Temple-Inland had actual knowledge that Pathex was breaching a duty to Invest Almaz.  Invest Almaz argued below, and presses on appeal, that a constructive knowledge instruction should have been given.

It is undisputed that, as the magistrate judge found, the New Hampshire Supreme Court has yet to expressly consider whether to adopt the tort of aiding and abetting a breach of fiduciary duty.  It was therefore the magistrate judge's duty to determine whether New Hampshire's Supreme Court would recognize the tort and how that Court would define the elements of the cause of action.  See Moores, 834 F.2d at 1107.  The magistrate judge, in a ruling that has not been appealed, concluded that the New Hampshire Supreme Court would recognize the tort, and would adopt a version incorporating the principles of aiding and

-64-

abetting liability set forth in the <u>Restatement (Second) of Torts</u>. <u>See</u> <u>Restatement</u> § 876(b) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . ."). Following other jurisdictions relying on these principles, he held that the tort would require Invest Almaz to prove three elements: (1) a breach of fiduciary obligations by Pathex; (2) knowing inducement or participation in the breach by the Temple-Inland; and (3) damages to Invest Almaz as a result of the breach. <u>E.g.</u>, <u>S & K Sales Co.</u> v. <u>Nike, Inc.</u>, 816 F.2d 843, 847-48 (2d Cir. 1987) (applying New York law); <u>Spinner</u> v. <u>Nutt</u>, 631 N.E.2d 542, 546 (Mass. 1994).

With respect to the "knowledge" element, the magistrate judge noted that, in the majority of jurisdictions recognizing the tort, actual knowledge of the breach of fiduciary duty is required. Concluding that the New Hampshire Supreme Court would adopt the majority rule on this issue, he instructed the jury as follows:

> In the context of this claim, to act knowingly means to act with actual knowledge. This means that Invest Almaz must prove that Temple-Inland actually knew two things: That Pathex owed a fiduciary duty to Invest Almaz, and that Pathex was breaching that duty. It

-65-

> is not enough for Invest Almaz to show that Temple-Inland would have known these things if it had exercised reasonable care.  However . . . it is not required to show that Temple-Inland acted with an intent to harm Invest Almaz.

Invest Almaz's position, below and on appeal, is that the magistrate judge should instead have followed a Second Circuit case employing a constructive knowledge standard.  See Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 283 (2d. Cir. 1992) (holding that "[a] defendant who is on notice that conduct violates a fiduciary duty is chargeable with constructive knowledge if a reasonably diligent investigation would have revealed the breach").  Invest Almaz further argues that the magistrate judge's error entitles it to a new trial on the aiding and abetting count.  Because Invest Almaz properly preserved its objection to the actual knowledge standard at all appropriate points below, its request for a new trial will be considered under the harmless-error standard of Fed. R. Civ. P. 61 if the actual knowledge instruction is determined to be incorrect.  See Beatty v. Michael Bus. Mach. Corp., 172 F.3d 117, 120 (1st Cir. 1999).

We find no error and therefore do not reach the harmless error analysis.  As is clear from Diduck itself, the constructive knowledge standard adopted in that case reflected unique factual and policy considerations not relevant here.  The

-66-

_Diduck_ rule was developed by the Second Circuit as part of a federal common law right of action against non-fiduciaries arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101 _et seq._ as amended (ERISA). _See id._ Following ERISA precedent, the court looked to trust case law and provisions of the _Restatement of Trusts_ in devising its constructive knowledge rule. _See Chemung Canal Trust Co._ v. _Sovran Bank/Maryland_, 939 F.2d 12, 16-18 (2d Cir. 1991) (concluding that Congress intended the courts to "fill any gaps in [ERISA] by looking to traditional trust law principles"); _see also Diduck_, 974 F.2d at 283 (noting _Restatement_ rule that a defendant may be chargeable with notice either as to fiduciary's status as trustee or that trustee is committing breach of trust) (citing _Restatement of Trusts_ § 326, cmt. b); _Id._ (noting _Restatement_ rule that a defendant on notice is chargeable with constructive knowledge if a reasonable investigation would have revealed the breach) (citing _Restatement of Trusts_ § 297, cmt. a). It is readily apparent that _Diduck_'s constructive knowledge holding has not been considered, even by courts in the Second Circuit, to alter the actual knowledge standard applied in other contexts. _See, e.g._, _Kolbeck_ v. _LIT Am., Inc._, 939 F. Supp. 240, 246 (S.D.N.Y. 1996), _aff'd_, 152 F.3d 918 (2d Cir. 1998) (unpublished table decision) (distinguishing _Diduck_ and holding

that, in cases of aiding and abetting a breach of fiduciary duty arising under New York common law, the actual knowledge standard remains in force).  We find nothing in Invest Almaz's unsupported arguments remotely adequate to convince us that this unique rule would be applied by the New Hampshire Supreme Court to this case.

### IV.

Having invested over $6 million in a transatlantic deal that ultimately came to naught, Invest Almaz's effort to recover some part of what it lost is understandable.  However, we find no error in the magistrate judge's rulings and concur that the facts of this case ultimately do not support a judgment against this defendant on the theories proposed.  The judgment of the district court is affirmed in all respects.

It is so ordered.