*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0056p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

MILES FARM SUPPLY, LLC,
                    *Plaintiff-Appellant,*

                                            No. 08-6093

            *v.*

HELENA CHEMICAL COMPANY,
                    *Defendant-Appellee.*
_____

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 06-00023—Thomas B. Russell, Chief District Judge.

Argued: January 11, 2010

Decided and Filed: February 25, 2010

Before: SUHRHEINRICH, SUTTON and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** M. Stephen Pitt, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, for Appellant. Robert B. Craig, TAFT, STETTINIUS & HOLLISTER LLP, Covington, Kentucky, for Appellee. **ON BRIEF:** M. Stephen Pitt, Jean W. Bird, Merrill S. Schell, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, Thomas J. Meyer, John David Meyer, MEYER, HAYNES, CRONE & MEYER, LLP, Owensboro, Kentucky, for Appellant. Robert B. Craig, TAFT, STETTINIUS & HOLLISTER LLP, Covington, Kentucky, John B. Nalbandian, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. Miles Farm Supply challenges the district court's summary disposition of its Kentucky-law claims that Helena Chemical Company aided and abetted a breach of fiduciary duty by three Miles employees and that, by aiding those employees, Helena tortiously interfered with Miles' prospective contractual relations. Because Miles

1

has failed as a matter of law to show that Helena had actual knowledge that the three employees were breaching a fiduciary duty, we affirm.

I.

Headquartered in Owensboro, Kentucky, Miles is a family-run agricultural supplier. Through its Big Rivers division, it sells wholesale agricultural chemicals to farm-supply dealers in western Kentucky, southern Indiana and southern Illinois.

Starting in 1998, Benny Tincher served as Miles' General Manager. The company, however, eliminated his position in 2004, shortly after Debra Seymour replaced her father as Miles' President. Seymour transferred Tincher's responsibilities to a Leadership Council, and piling insult on injury (so far as Tincher was concerned) Seymour did not select Tincher for one of the six Leadership Council positions.

By October 2004, Tincher's future with Miles did not look promising. At that time, Seymour wanted Tincher to leave the company—and told him so—but ultimately decided that Miles still needed him after conversations with her father. On December 3, 2004, she made Tincher head of business development.

By then, it turns out, Tincher had begun exploring other opportunities. In mid-November, he reached out to a friend at Helena, a large wholesale agricultural supplier. On December 16, he met with Charles Adams, Randy Parman and Doug Goff, three high-level Helena employees, to discuss potential job opportunities. Two other Miles employees joined him at the meeting: Brian Mattingly, Big Rivers' sales and marketing manager, and Jerry Mattingly (no relation), Big Rivers' operations manager. After Tincher and the Mattinglys made their pitch, Parman told them that he would need a budget before moving forward.

Helena and the trio of Tincher and the Mattinglys remained in phone and email contact through January 8, 2005. In particular, the trio worked with Helena employees to put together a budget for a potential Helena branch in western Kentucky.

On January 7, 2005, a Friday, Tincher and the Mattinglys met with several high-level Helena employees, including Michael McCarty, Helena's President and CEO. The trio suggested that several Miles employees might join them at a new Helena branch in Owensboro but, in response to questions from Helena representatives, assured Helena that

they had not yet recruited any Miles employees. The next morning, a Saturday, Helena hired the trio to open a western Kentucky branch and told them they could start offering jobs to Big Rivers employees on Monday morning.

That Saturday, Tincher and the Mattinglys had lunch with three Big Rivers employees—Greg Clifton, Anita Fuqua, Rick Peveler—and told them that they planned to resign Monday morning and that Clifton, Fuqua and Peveler should think about whether they wanted to work for Helena because they might have job offers from the company on Monday. They said the same thing to Matt Hayden, a Big Rivers salesman, when they encountered him by chance that afternoon. Brian Mattingly also used the weekend to arrange a Monday-morning meeting with his Big Rivers sales staff. At some point over the weekend, Tincher e-mailed Helena the names, positions and salaries of several employees that Helena might wish to offer jobs on Monday.

On Monday morning, Tincher and the Mattinglys resigned. Later that morning, they extended offers to the sales staff plus Clinton, Fuqua and Peveler. All of them accepted Helena's offer over the next several days.

Later in 2005, Tincher and the Mattinglys sued Miles in Kentucky state court for withholding bonuses owed them. Miles counterclaimed for breach of fiduciary duty. That suit, the parties tell us, remains pending in state court.

In January 2006, Miles filed a separate action in state court against Helena, claiming that Helena aided and abetted fiduciary breaches by Tincher and the Mattinglys and that Helena tortiously interfered with Miles' prospective contractual relationships (along with four other claims not at issue in this appeal). Helena removed the action to federal court. After discovery, Helena moved for summary judgment on both claims, and the district court, applying Kentucky law, granted the motion, holding that Miles could not show an underlying fiduciary breach by Tincher or the Mattinglys, which defeated both claims.

II.

Consistent with the district court, we think Helena is entitled to summary judgment on Miles' aiding-and-abetting claim. Inconsistent with the district court, we think it appropriate to rely on a narrower ground for reaching that decision. The easier question, as

we see it, is not whether Tincher and the Mattinglys breached a fiduciary duty, a matter the parties are free to deal with in the action pending in state court. It is whether Helena knew about the alleged breach, as Kentucky law requires before treating someone as an aider and abettor.

First some basics. Kentucky law recognizes a claim for fiduciary breach. *See Aero Drapery of Ky., Inc. v. Engdahl*, 507 S.W.2d 166, 169 (Ky. 1974). It recognizes a claim for aiding and abetting tortious conduct, which covers fiduciary-breach claims. *See Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). And it, like the majority of jurisdictions, follows the Restatement in defining the claim. *See* Restatement (Second) of Torts § 876; *Farmer v. City of Newport*, 748 S.W.2d 162, 164–65 (Ky. Ct. App. 1988). All of this means that Miles must show the following to prevail: (1) that at least one Miles employee breached a fiduciary duty; (2) that Helena gave "substantial assistance or encouragement" to that employee; and (3) that Helena "kn[ew] that the [employee's] conduct" breached a fiduciary duty. Restatement (Second) of Torts § 876(b); *see Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 533 (6th Cir. 2000).

As to the third element of the claim, constructive knowledge does not suffice; Miles must show that Helena had "*actual* knowledge" of any breach. *Aetna*, 219 F.3d at 536; *see also GCM, Inc. v. Ky. Cent. Life Ins. Co.*, 947 P.2d 143, 147–48 (N.M. 1997). Under Kentucky law, that means showing Helena knew not just that the trio's conduct breached a fiduciary duty but also that the trio did not have consent from Miles to seek out other opportunities. *See Aero Drapery*, 507 S.W.2d at 169 (Ky. 1974); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006).

Miles cannot satisfy all elements of the test, and in particular, has not made out a cognizable claim that Helena had "actual knowledge" of any breach. What did Helena know? It is by no means clear, to start, that Helena knew it was dealing with fiduciaries. The classic fiduciaries in this context, the ones presumed to owe such duties, are directors or officers, *see Steelvest*, 807 S.W.2d at 483, not a demoted "General Manager," a "Sales and Marketing Manager" and a "Sales/Operations/Logistics Manager," as the three Miles employees introduced themselves, App'x 7001. Perhaps the relevant Helena corporate officers might have thought that the three did business on behalf of their employer and

performed duties requiring "trust or confidence" in their integrity and loyalty, though Miles never asked these questions in their depositions. *Steelvest*, 807 S.W.2d at 485; *see DSG Corp. v. Anderson*, 754 F.2d 678, 682 (6th Cir. 1985). And perhaps the relevant Helena officers might have thought that this "trust or confidence" creates a fiduciary relationship (if indeed it did).

But that is as far as (and perhaps much farther than) a jury reasonably could extend the chain of reasonable inferences. Nothing in the record supports the additional necessary inference that Helena knew that Tincher and the Mattinglys breached their fiduciary obligations during their December 2004 and January 2005 conversations with Helena. At the initial December 16 meeting, the trio told Helena executives that they "wanted to be legal" while exploring a possible business relationship with Helena. App'x 3822. Nothing after that meeting showed *to Helena* that the trio did not mean it, either based on what they later said or later did. Settled law permits an employee to prepare to compete with his employer before leaving the company, provided the employee does not act unfairly or otherwise injure his principal before the departure. *See* Restatement (Second) of Agency § 393 cmt. e (stating an employee may "make arrangements to compete" before resigning "except that he cannot properly use confidential information peculiar to his employer's business and acquired therein"). No evidence shows that the trio attempted to usurp any corporate opportunities of Miles by waiting to consummate sales until after they left Miles or by urging Miles' clients to do business with Helena before they left Miles—much less that they signaled to Helena that they would do so. As the unrebutted evidence shows, the Big Rivers division had its most profitable year in the calendar year ending in 2005, and no evidence shows, or even suggests, that the trio delayed any sales until after their move to Helena. So far as Helena was concerned, then, the trio told the company at the outset that the trio "wanted to be legal," App'x 3822, the law permits an employee to prepare to compete before leaving a job and the trio did not usurp any corporate opportunities on Helena's behalf before leaving Miles. On this record, Helena had no "actual knowledge" that the Miles employees were breaching any fiduciary duty.

In trying to show the contrary, Miles features two types of evidence. It first points to a budget prepared by the trio at Helena's request. Yet it is hardly unusual for a company contemplating hiring individuals to start up a branch office to request them to project the

costs and expenses of the proposed operation—and Miles does not argue otherwise.  The trio's at-will employment at Miles also offered no suggestion to Helena that they were doing anything other than what all at-will employees may do:  pursue a new employment opportunity.  The trio's response to Helena's request for a budget also did not give Helena actual knowledge of any fiduciary breach.  Helena's executives all testified that they thought that the projections were based on the trio's industry experiences, which were considerable.

Miles responds that one of the notes on the budget suggested that it was based on "75% of current" sales and expenses.  Establishing a cognizable claim that Helena knew the trio breached a fiduciary duty requires more, however.  Miles must also show that Helena asked for confidential information or otherwise knew the information was protected and could not be disclosed without a breach.  Many law firms—all privately owned businesses—publicly disclose their revenues and profits annually.  So too do agricultural supply companies:  Brian Mattingly obtained 2003 agricultural chemical sales figures for seven entities at "an industry-meeting presentation," including Helena and a private "distributor conglomeration" to which Miles belongs.  App'x 1374–75.  Not only did Helena's request for a budget—and the trio's response—fail to establish a cognizable claim that Helena had actual knowledge of a fiduciary breach, but this sequence of events also failed to establish that Helena provided "substantial assistance" to any breach, the second element of an aiding-and-abetting claim.  A request for a budget is not a request for a fiduciary breach, much less assistance in the breach.

Miles also relies on the trio's efforts to recruit other Miles employees.  Yet any facilitation of a supposed breach occurred after the trio resigned or roughly contemporaneous with that resignation.  Helena's offer to the trio came on Saturday, January 8, and they accepted that day.  As on December 16, moreover, so too on January 7:  The trio assured Helena that they had not yet talked with any other Miles employees about leaving Miles and joining Helena.  Confirming the point, Helena directed Tincher on the morning of January 8 that he *could not* "make any offers" to Miles' employees until the morning of Monday, January 10, when the trio planned to resign.  Helena thus had no actual knowledge of any (alleged) breach on this score, and indeed attempted to ensure that no breach would occur.

Miles responds by pointing to two things that happened over the weekend: Brian Mattingly arranged a Monday-morning meeting with Big Rivers' sales staff, and the trio met with Clifton, Fuqua, Peveler and Hayden on Saturday. Even aside from the reality that all of this happened over the weekend and that no job offers were in fact made until Monday, Miles has no evidence that Helena had any knowledge of these activities or that Helena otherwise did not mean what it said when it told the trio *not* to make any job offers until they had left Miles. From beginning to end, Helena did not participate in any recruitment of other employees until after the trio had left Miles. In the end, Miles has not established a cognizable claim that Helena knew that Tincher and the Mattinglys breached any (alleged) fiduciary duties to Miles.

This same flaw undermines Miles' other arguments. Even if, as Miles argues, Tincher and the Mattinglys breached their fiduciary duties as soon as they "first ma[d]e arrangements or beg[a]n preparations to compete" against Miles on December 16, *Steelvest*, 807 S.W.2d at 483, that does not satisfy the knowledge requirement. The question is not what Helena *might* have known from the December 16 meeting and the negotiations that followed it, but what Helena *actually* knew.

## III.

Miles' claim that Helena tortiously interfered with prospective contracts necessarily fails as well. To succeed, Miles must (1) identify a prospective contractual relation (2) that Helena interfered with (3) through "significantly wrongful conduct." *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857–59 (Ky. 1988). Because Miles' "wrongful conduct" allegations depend on its aiding-and-abetting claim and because that claim fails as a matter of law, Miles necessarily cannot obtain relief under this theory.

## IV.

For these reasons, we affirm.