RIPPLE, Circuit Judge,
dissenting:
After reviewing the evidence presented at trial, I respectfully part company from the majority’s determination that the jury’s verdict should stand. Amegy offered no evidence, circumstantial or direct, to support the jury’s determination that Alex.Brown knew about Ameg/s interest in the Host Hotels stock or that Alex. Brown engaged in affirmative misconduct in completing Johnson’s securities transaction. I therefore would reverse the district court’s decision denying Alex.Brown’s motion for judgment as a matter of law.
Reversal of a jury verdict is not a matter to be undertaken lightly; the Federal Rules of Civil Procedure stringently circumscribe our review. As the majority appropriately recognizes, “[cjredibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.”[1] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)). We must “give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontra-dicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.” Id. at 151, 120 S.Ct. at 2110 (internal quotation marks omitted); accord Christopher v. Florida, 449 F.3d 1360, 1364 (11th Cir.2006).
A.
Alex.Brown contends that, as a securities intermediary, it is immunized from liability by O.C.G.A. § 11-8-115, Georgia’s enactment of U.C.C. § 8-115. This section of the Uniform Commercial Code provides that a securities intermediary is not liable to a person having an adverse claim to a financial asset unless the intermediary “[a]cted in collusion with the wrongdoer in violating the rights of the adverse claimant.” [2] O.C.G.A. § 11-8-115(2).
*935 To determine whether an intermediary’s conduct amounts to collusion, the U.C.C. employs a standard “akin to” the aider or abettor standard under the Restatement (Second) of Torts § 876.[3] O.C.G.A. § 11-8-115 cmt. 5; see also Majority Op. at 928-29 (reproducing text of § 876). The official comments to the U.C.C. provide additional guidance for interpreting and applying the collusion test in § 8-115.[4] These comments explain that “[kjnowledge that the action of the customer is wrongful is a necessary but not sufficient condition of the collusion test.” O.C.G.A. § 11 — 8— 115 cmt. 5. The U.C.C. defines “knowledge” as actual knowledge. See id. § 11-1-201(25). Even if an intermediary is aware of an adverse claim, it has no duty to investigate. As the comments explain, “[i]t is not the role of the record-keeper to police whether the transactions recorded are appropriate, so mere awareness that the customer may be acting wrongfully does not itself constitute collusion.” Id. § 11-8-115 cmt. 5. The examples provided in the official comments make clear that, even if a securities intermediary has actual knowledge that a person asserts a claim to the securities, the intermediary is insulat *936 ed from liability.[5] The comment also sets forth the policy reasons for such a rule:
Even though a firm has notice that someone asserts a claim to a customer’s securities or security entitlements, the firm should not be placed in the position of having to make a legal judgment about the validity of the claim at the risk of liability either to its customer or to the third party for guessing wrong. Under this section, the broker or securities intermediary is privileged to act on the instructions of its customer or entitlement holder, unless it has been served with a restraining order or other legal process enjoining it from doing so.
Id. cmt. 3.
The comments further explain that an intermediary is only liable. “in egregious cases where its action goes beyond the ordinary standards of the business of implementing and recording transactions, and reaches a level of affirmative misconduct in assisting, the customer in the commission of a wrong.” Id. cmt. 5. It is only when “the conduct of a securities intermediary ... rises to a level of complicity in the wrongdoing of its customer or principal [that] the policies that favor protection against liability do not apply.”[6] Id.
In sum, to succeed in an action for conversion against a securities intermediary, a plaintiff must show collusion by proving (1) that the intermediary had actual knowledge' that the action of the customer was wrongful, and (2) that the intermediary engaged in affirmative misconduct in assisting the customer in the commission of the wrong. We therefore must determine whether the jury was presented with sufficient evidence from which it reasonably could conclude that Alex.Brown had actual knowledge that Johnson’s sale of the Host Hotels stock was wrongful and that Alex. Brown engaged in affirmative misconduct in assisting Johnson in selling the Host Hotels stock.
B.
1.
We turn first to the requirement that Amegy prove that Rhodes had actual knowledge of Amegy’s interest in the Host Hotels stock. The record makes clear that Amegy’s assertion that Rhodes had actual knowledge of Amegy’s lien on the Host Hotels stock is without any support. Indeed, on appeal, Amegy never acknowledges that it must prove actual knowledge; it merely repackages the same arguments that it made in the district court to establish that the jury heard ample circumstantial evidence to allow it to find *937 AIex.Brown liable for collusion under § 8-115.[7]
The evidence presented at trial included the KYC report, which contained a reference to'Amegy’s lien on unnamed property owned by Johnson, and Rhodes’s testimony that he was not aware of Amegy’s lien on the Host Hotels stock prior to the commencement of this litigation. The parties also presented evidence that the redemption of the Host Hotels partnership units and the sale of the resulting stock occurred while Johnson was in default on his Amegy loan; that Rhodes communicated with Johnson and his assistant in the time leading up to the sale of the Host Hotels stock while, at the same time, Johnson was in contact with Amegy; that Rhodes told his assistant that Johnson’s account had to be set up fast; that Rhodes sold the stock before the certificate had been delivered; that Rhodes opened Johnson’s account with the stated objectives of “Growth” and “Capital Appreciation” but, after the close of the sale, the proceeds immediately were wired to Johnson; that Rhodes had a long-term relationship with Johnson; and that Rhodes profited from the sale through the receipt of a commission.
These facts hardly permit a rational decision maker to conclude that Alex.Brown, acting through Rhodes, had actual knowledge of Amegy’s interest in the Host Hotels stock at the time Johnson sold it. Consequently, there is no evidence that Alex.Brown knew that Johnson’s conduct was wrongful. First, the fact that Amegy filed a UCC-1 financing statement does not establish that Alex.Brown had actual knowledge of Amegy’s interest in the Host Hotels stock. Section 8-105(e) of the U.C.C.. expressly provides that the “[fjiling of a [UCC-1] financing statement under Article 9 of this title is not notice of an adverse claim to .a financial asset.” O.C.G.A. § ll-8-105(e).[8] If the filing of a financing statement were sufficient to establish an intermediary’s knowledge of an adverse claim, the actual knowledge requirement under § 8-115 would be transformed into a constructive knowledge standard, and securities intermediaries would be required, contrary to the specific language of the statute, to investigate in depth their customers and the antecedent business affairs of those customers. The evidence clearly demonstrates that- the KYC report provided to Rhodes did not show that Amegy had a lien on the Host Hotels stock. For the U.C.C. financing statement to supply the knowledge required under §.8-115, Alex.Brown would have had to review the actual filing. However, there is no evidence that Rhodes ever reviewed, or indeed had any reason to review, the UCC-1 financing statement.
*938 The remaining evidence relied upon by Amegy only supports the contention that Alex.Brown could have known that Amegy had an interest in the Host Hotels stock. There is no question that Alex.Brown never had a duty to investigate beyond the KYC report. What Alex.Brown could have known about Amegy’s interest simply does not satisfy the actual knowledge requirement under § 8-115. See O.C.G.A. § 11-8-115 cmt. 5.[9]
The majority suggests several possible inferences that, in its view, support the jury’s verdict. It first suggests that a reasonable jury could infer that, based on their relationship, Johnson and Rhodes might have discussed Amegy’s interest in the Host Hotels stock, “even where those matters did not bear directly on their professional conduct.” Majority Op. at 929. Second, the majority suggests that a jury possibly could infer that Rhodes’s review of the KYC report might have led him to investigate Amegy’s lien, and, consequently, he might have discovered Amegy’s interest in the Host Hotels stock. Third, the majority suggests that a jury could infer that Rhodes, because of his relationship to Johnson, might have become “aware of the wrongfulness of Johnson’s actions.” Id. at 930. And finally, the majority states that a jury could infer that, because Rhodes followed his client’s direction to set up a trading account and execute the stock sale quickly, he must have “had a motive to apprise himself of the details of Johnson’s finances” and must have actually done so. Id. A critical examination of the majority’s suppositions simply will not support the legal liability that it wishes to impose on Alex.Brown.
As a threshold matter, the majority’s suppositions are based on several factual inaccuracies. It states that Rhodes “analyzed Johnson’s liquidity and the availability of the HLP partnership interest as a source of repayment for the Deutsche Bank PWM loan in the event of a default.” Id. at 929; see also id. at 925 (stating that “Rhodes analyzed Johnson’s liquidity and determined that the same HLP partnership interest subject to the Amegy Bank loan could be a source of repayment for the Deutsche Bank loans in the event of default”); id. at 931 (stating that “Rhodes was intimately aware of Johnson’s financial situation”). This assertion is unsupported *939 by the record. Instead, the record reflects that DB Private Wealth Mortgage (“PWM”) generated a credit memorandum that listed the Host Hotels units among Johnson’s assets. The memorandum affirmatively states that there were “[n]o loans outstanding and/or no debt” on the units.[10] More fundamentally, the parties do not contend that Rhodes or Alex.Brown had access to the credit memorandum.[11] Indeed, the evidence presented at trial indicates that Rhodes never saw the credit memorandum.[12]
The majority similarly asserts that “Rhodes again investigated [Johnson’s] financial situation” “[bjefore opening a margin account for [him].” Id. at 929. That assertion also is unsupported by the record. In its closing argument, Amegy conceded that Rhodes and Alex.Brown “did nothing to investigate the very information that they had in their file.”[13] The record instead simply suggests that Rhodes could have investigated further Johnson’s financial situation — an obligation not placed on him by the governing statute.[14]
The majority further states that Rhodes’s “substantial commission” “g[a]ve him a hefty financial interest in keeping Johnson’s account current.” Id. at 929. The record also does not support that conclusion. Although Rhodes received approximately $23,000 as a commission for originating Johnson’s loan, there is no indication that his ability to retain that commission depended on Johnson’s repayment of the loan. Simply stated, the evidentiary record fails to support the majority’s conclusions.
Turning to the majority’s substantive assertions, one over-arching flaw dominates its presentation: it never explains how the factors on which it relies would allow a jury to infer that Rhodes had actual knowledge of Amegy’s interest. How, for example, does the pre-existing relationship between Rhodes and Johnson allow a jury to infer that they must have discussed the intricacies of Amegy’s lien? Surely, .in most circumstances, a securities intermediary develops a relationship with clients. Such a relationship hardly allows a jury to conclude that the client actually told his broker about all the wrongful conduct of his business career.
The majority also concludes that, because “Johnson called Rhodes twenty-four minutes after Bobo sent an email to Ame-gy Bank falsely representing that Johnson *940 continued to hold the HLP partnership interest,” a jury could infer — rationally— that Rhodes “was aware, of the wrongfulness of Johnson’s actions.” Id. at 930. How the proximity of Johnson’s phone call with his lawyer and Johnson’s contacting his broker permit the conclusion that Rhodes, the broker, was aware of the wrongfulness of Johnson’s actions with Bobo is never explained. Careful analysis demonstrates starkly the lack of substance to the majority’s position. All this circumstantial evidence establishes is that, on that day, Johnson may have been up to no good. It hardly suggests that he told his broker all about it.
Amegy’s argument is simple. Too simple. It suggests that the timing and sequence of events provided circumstantial evidence of Alex.Brown’s knowledge. Johnson’s assistant, Martin, emailed Rhodes twenty-four minutes after Johnson had “receiv[ed] notice from his attorney that he had ten days to make his delinquent payment to Amegy.”[15] Rhodes later emailed Martin, telling her to let him know if she needed any help, and emailed his own assistant, instructing her to take Johnson’s KYC report and set up a trading account, stating that he needed it done fast. Based on those emails, Amegy submits that the jury was entitled to infer that Rhodes knew that Amegy had a present security interest in the Host Hotels stock and that, by selling the stock, Johnson was violating his security agreement with Ame-gy. Nothing in this rather prosaic sequence of events between a customer and his securities intermediary contains a whisper of an echo of any wrongdoing.[16]
Finally, the majority relies on Rhodes’s “suspicious conduct.” Id. The majority does not explain, however, why Rhodes’s conduct was suspicious. Nor does the record establish that Rhodes’s conduct was in any way out of the ordinary. That Rhodes, a securities intermediary, was responsive to his client’s needs certainly does not support an inference that he knew of his client’s wrongful conduct and most certainly does not suggest that he cooperated in the chent’s wrongdoing. The factors on • which the majority relies, which individually fail to support the jury’s verdict, do not fare any better when viewed in the aggregate. The circumstantial evidence simply does not allow a jury to find that Alex. Brown actually knew that Amegy had a security interest in the Host Hotels stock.[17]
*941 Here, in stark contrast to the irrelevant authorities relied upon by the majority and Amegy, nothing about Johnson’s transaction independently indicates that it was wrongful. The evidence shows that Alex.Brown knew that Johnson wanted to sell the stock quickly. However, it is not wrongful, indeed it is commonplace, for a customer to request that its securities intermediary quickly carry out its transaction. Indeed, Rhodes testified that Johnson frequently requested that his transactions be carried out expeditiously.[18] In the absence of evidence that Alex.Brown knew of Amegy’s security interest, the. nature of the transaction was insufficient to demonstrate to Alex.Brown that it was wrongful. There is no similar evidence from which a trier of fact can infer that Rhodes ever had any knowledge of Amegy’s present security interest in the stock. Instead, the jury would have to infer that because Rhodes could have discovered Amegy’s interest if he had assumed a duty not imposed on him by law, it is likely that he did obtain such knowledge-and colluded with Johnson.
*942 The majority also states that the jury was free to decide whether it believed that Rhodes was telling the truth when he testified that he was not aware of Amegy’s lien. At trial, Rhodes stated that he did not know that the shares of stock that he sold “were identified in Amegy’s security agreement and in Amegy’s UCC-1.”[19] He testified that he “never looked at a UCC until [Amegy’s counsel] showed [him] at a deposition.”[20] He then reiterated that, prior to his deposition, he had “never seen the documents before.”[21] Although, as a general matter, a jury may assess a witness’s credibility, a jury’s negative credibility determination, standing alone, cannot fill an evidentiary void. The Supreme Court has explained that “[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.” Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984); see also Majority Op. at 927 (recognizing that a jury must “rely on circumstantial evidence to reach a conclusion in conflict with direct evidence”).[22]
Accordingly, the jury could have found that Alex.Brown knew of Amegy’s interest only if there was affirmative evidence contradicting Rhodes’s testimony, i.e., evidence that he had actual knowledge of Amegy’s lien. Because Amegy failed to provide circumstantial evidence that would support a finding that Alex.Brown had actual knowledge of Amegy’s security interest, any determination by the jury that Rhodes’s testimony was incredible would have been inconsequential.
2.
Amegy’s inability to establish actual knowledge — an absolute requirement if it is to prove its case — explains why it relies so heavily on constructive knowledge, and failure to investigate theories, despite the stark reality that, under the statute, these *943 concepts simply cannot help it carry the day. The record shows that Amegy’s position throughout trial was that Alex.Brown became, or should have become, aware of Amegy’s security interest in the Host Hotels collateral when it obtained the KYC report — even though the KYC report did not identify the property in which Amegy had an interest. In its complaint, Amegy alleged that the defendants, including Alex.Brown, had run a U.C.C. search on Johnson that “revealed that Amegy was a secured creditor of Johnson pursuant to a UCC Lien.”[23] In its pretrial statement, Amegy contended that the KYC report “identified Amegy’s security interest in the Partnership Units.”[24] In accordance with its theory of liability, Amegy argued in its opening statement that its UCC-1 financing statement “put[ ] the world on notice of Amegy’s claim” to the Host Hotels collateral.[25] Amegy further submitted that once “you have the filing number of a UCC-1 financing statement, it takes you no more than two minutes to access it on the internet and you can see the UCC-1 financing statement.”[26] Amegy submitted that, “incident to running [the] EYC report, Deutsche Bank was alerted to [Amegy’s] UCC-1” financing statement.[27] Amegy argued “that this was notice to Deutsche Bank [that] they should do something” and that the jury should “decide what they should have done.”[28] In summation, Ame-gy stated that, because the filing number, date, and other information in the KYC report revealed the UCC-1 financing statement that, if found and examined, identified the collateral, Alex.Brown “knew that there was this loan” and “knew it was secured.”[29] During closing argument, Amegy similarly argued that the KYC report showed the Amegy hen and that “the testimony is pretty clear that a mouse click away, and you could have actually pulled up the UCC-1 statement that delineated all of those six collateral that Amegy had for its loan that were on the UCC-1.”[30] It then argued that “Rhodes didn’t pick up the phone and call Amegy” and that Alex. Brown “did nothing to investigate the very information that they had in their file.”[31]
In short, unable to prove what the statute requires — actual knowledge — Amegy attempts to make its case by imposing on Alex.Brown a duty that the statute specifically does not impose on it — the duty to go behind the stock transaction and investigate the propriety of its customer’s motives.
C.
Having established that the evidence does not support the finding that Alex. Brown knew about Amegy’s lien, I turn briefly to the second element of the collusion standard under § 8-115. In order to impose liability on a securities intermediary, the U.C.C. requires that an intermediary’s conduct be egregious and go “beyond the ordinary standards of the business of implementing and recording transactions,” reaching the “level of affirmative misconduct in assisting the customer in the commission of a wrong.” O.C.G.A. § 11-8-115 *944 cmt. 5. Amegy submits that Johnson’s transaction with Alex.Brown was atypical because Alex.Brown quickly opened an account for Johnson, sold the Host Hotels stock before it had physical possession of the stock certifícate, and then immediately wired all of the money to Johnson’s account, even though the account was set up just days before.
There is no evidence in the record to support the finding that Alex.Brown’s conduct went beyond the ordinary implementation of a securities transaction and rose to the level of affirmative misconduct. Rhodes explained that it is “[ejxtremely typical” for him to sell stock without having physical possession of the stock certificate.[32] He also testified that, if he fails to follow a customer’s instruction to buy or sell stock, Alex.Brown is liable to the customer for any losses that result from the delay. Amegy offered no evidence to rebut Rhodes’s testimony or otherwise show that Alex.Brown affirmatively acted to convert the Host Hotels stock. Alex.Brown simply followed the requests of its customer in executing a securities transaction.
D.
Finally, I stress the significance of the majority’s decision and its profound impact on the financial industry. The drafters of the U.C.C. recognized that
[i]t is essential to the securities settlement system that brokers and securities intermediaries be able to act promptly on the directions of their customers. Even though a firm has notice that someone asserts a claim to a customer’s securities or security entitlements, the firm should not be placed in the position of having to make a legal judgment about the validity of the claim at the risk of liability either to its customers or to the third party for guessing wrong.[33]
O.C.G.A. § 11-8-115 cmt. 3. Accordingly, in enacting the U.C.C., the Georgia legislature, as have other states that have enacted this section of the Uniform Code, sought to protect securities intermediaries and the securities industry from unnecessary, costly interference and delay. It specifically refused to impose on intermediaries, except in narrow circumstances, the burden of investigating adverse claims to the stock in the transactions that they execute. It opted, instead, to establish a formidable evidentiary burden for establishing liability, a burden that allows intermediaries to follow their customers’ instructions and ensures that the securities trades are executed efficiently.
The burden that today’s decision imposes on securities intermediaries is clear. It puts intermediaries in the impossible position of choosing between two paths, both leading inevitably to legal liability. Customers, almost as a matter of course, will want their transaction completed quickly. In some of these situations there will be a lien or some adverse claim to the security that the intermediary could discover but about which it does not know. Under the majority’s decision, an intermediary will have to take the time to confirm that a customer’s securities are unencumbered or otherwise verify that the transaction is not *945 wrongful. In so doing, the intermediary will fail to follow faithfully the customer’s instruction to act expeditiously. The majority’s decision thus places securities intermediaries in the untenable position that the drafters of the Uniform Code — and the Georgia legislature — sought to avoid.
This decision is not, of course, binding on the courts of Georgia or, because my colleagues have determined that its decision should be an unpublished and therefore non-precedential decision, ' on the United States courts of this circuit. See 11th Cir. R. 36-2. But nevertheless, its existence will be well-known throughout the securities industry, and its holding will cast a heavy cloud of doubt on stock transactions in Georgia and, because it purports to interpret the Uniform Code, through the United States. Only the Supreme Court of Georgia, or another panel of this court in a published opinion, can correct the majority’s interpretation of § 8-115 and protect securities intermediaries from liability in the absence of a1 showing of actual knowledge and affirmative misconduct, as intended by the drafters of the Uniform Commercial Code and. by the Georgia legislature. Accordingly, I1 respectfully dissent.

. For the majority, this case “boils down to credibility.” Majority Op. at 931 (internal quotation marks omitted). I respectfully disagree. We must determine whether Amegy presented sufficient circumstantial evidence to allow a reasonable jury to find that Alex. Brown had actual knowledge of Amegy’s interest in the Host Hotels stock. As discussed more fully below, I believe that we must reverse the district court’s decision regardless of the jury’s credibility determination about Rhodes’s testimony.

. Section 11-8-115 provides, in full:
A securities intermediary that has transferred a financial asset pursuant to an effective entitlement order, or a broker or other agent or bailee that has dealt with a finan *935 cial asset at the direction of its customer or principal, is not liable to a person having an adverse claim to the financial asset, unless the securities intermediary, or broker or other agent or bailee:
(1) Took the action after it had been served with an injunction, restraining order, or other legal process enjoining it from doing so, issued by a court of competent jurisdiction, and had a reasonable opportunity to act on the injunction, restraining order, or other legal process; or
(2) Acted in collusion with the wrongdoer in violating the rights of the adverse claimant; or
(3) In the case of a security certificate that has been stolen, acted with notice of the adverse claim.
O.C.G.A. § 11-8-115.

.Courts generally agree that constructive knowledge is insufficient to establish liability under § 876. See, e.g., Miles Farm Supply, LLC v. Helena Chem. Co., 595 F.3d 663, 666 (6th Cir.2010) (noting that the plaintiff must show that the defendant “had ‘actual knowledge' of any breach” (emphasis in original)); Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir.2006) (noting "that actual knowledge is required” for aider and abetting liability under New York law); Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 82 (1st Cir.2001) ("The magistrate judge, following the majority of jurisdictions recognizing this tort, concluded that Invest Almaz had to prove that Temple-Inland had actual knowledge that Pathex was breaching a duty to Invest Almaz.”); see also 109 Am.Jur. Proof of Facts 3d 319 § 9 (2009) ("Actual knowledge is required; constructive knowledge generally will not sustain this element.”). But cf. Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 283 (2d Cir.1992) (holding that "constructive knowledge suffices” to establish knowledge of a fiduciary’s breach of duty and citing § 876); see Invest Almaz, 243 F.3d at 83 (refusing to apply Diduck because "the constructive knowledge standard adopted in that case reflected unique factual and policy considerations not relevant here” and noting that "the court looked to trust case law and provisions of the Restatement of Trusts in devising its constructive knowledge rule”). Indeed, even the cases upon which Amegy relies recognize that Amegy’s theory of liability is faulty. See, e.g., Aetna Cas. & Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 536 (6th Cir.2000) ("We stress that the requirement is actual knowledge. ...” (emphasis in original)).

.Both this court and Georgia courts recognize that the official comments to the U.C.C. shed substantial light on a provision’s meaning. See Weathersby v. Gore, 556 F.2d 1247, 1256 (5th Cir.1977) (recognizing that U.C.C. official comments "are by far the most useful aids to interpretation and construction” (internal quotation marks omitted)); Sun v. Mercedes Benz Credit Corp., 254 Ga.App. 463, 562 S.E.2d 714, 717 (2002); Warren’s Kiddie Shoppe, Inc. v. Casual Slacks, Inc., 120 Ga. App. 578, 171 S.E.2d 643, 645 (1969) (noting that when the Georgia legislature adopts a U.C.C. provision verbatim, “the intentions of the drafters of the [U.C.C.] as evidenced in the official comments to the [U.C.C.] should be given due consideration”).

. Specifically, examples three and four indicate that when an adverse claimant calls an intermediary, informs it of its interest, and demands that the intermediary not trade the securities, the intermediary still may be protected. See O.C.G.A. § 11-8-115 cmt. 3.

. The parties rely on cases applying the general aider and abettor standard from Restatement (Second) of Torts § 876 to analyze the requirements under U.C.C. § 8-115. Although these cases are often helpful, the U.C.C. adopted a standard “akin to” the § 876 standard, see O.C.G.A. § 11-8-115 cmt. 5, and the comments make clear that more than actual knowledge is required to impose intermediary liability, see id. cmts. 3, 5; see also 8 David Frisch, Lawrence's Anderson on the Uniform Commercial.Code § 8-115:9 (3d ed.1996) (suggesting that “the collusion exception will be interpreted to apply only when the customer and the conduit know that their action violates rights of an adverse claimant and join together with the intention to produce that violation or act with reckless indifference to the fact that the violation will occur” (emphasis added)), Accordingly, to the extent that those cases interpreting § 876 require something other than actual knowledge or impose a lesser burden than that required under § 8-115(2), the cases are inapposite.

. Contrary to the majority’s assertion, Amegy also contends that it did not need to prove that Alex.Brown had actual knowledge of Amegy’s lien. Amegy relies'on Banner Bank v. First Community Bank, 854 F.Supp.2d 846, 857 (D.Mont.2012), for the proposition that "willful ignorance satisfies the collusion exception.” Appellee's Br. 40 (internal quotation marks omitted). However, § 8-115 does not incorporate the. willful blindness test, unlike other provisions of the U.C.C. Cf. O.C.G.A. § 11-8-105 cmt. 4 (noting that, by providing "that a person has notice of an adverse claim if the person is aware of a significant probability that an adverse claim exists and deliberately avoids information that might establish the existence of the adverse claim,” § 105 "intended to codify the 'willful blindness’ test”). As described above, § 8-115 requires that a securities intermediary have actual knowledge of a customer's wrongful conduct.

. " ‘Adverse claim’ means a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset.” O.C.G.A. § ll-8-102(a)(l).

. See also El Camino Res., Ltd. v. Huntington Nat’l Bank, 712 F.3d 917, 923 (6th Cir.2013) (holding that, although a bank had “a strong suspicion of wrongdoing” by its customer, it did not have the actual knowledge required to be liable as an aider and abettor); Aetna Cas. & Sur. Co., 219 F.3d at 536 ("We stress that the requirement is actual knowledge (which, again, may be proven by circumstantial evidence), and therefore evidence establishing negligence, i.e., that a bank 'should have known,’ will not suffice.” (emphasis in original)); cf. ComTran Grp., Inc. v. United States Dep’t of Labor, 722 F.3d 1304, 1308 (11th Cir.2013) ("An example of actual knowledge is where a supervisor directly sees a subordinate’s misconduct. An example of constructive knowledge is where the supervisor may not have directly seen the subordinate’s misconduct, but he was in close enough proximity that he should have.” (citation omitted)); Shacket v. Philko Aviation, Inc., 841 F.2d 166, 171 (7th Cir.1988) (noting that implied actual notice, which “requires (1) actual knowledge of (2) highly suspicious circumstances, coupled with (3) an unaccountable failure to react to them,” is not the equivalent of actual knowledge); In re Agape Litig., 681 F.Supp.2d 352, 363-64 (E.D.N.Y.2010) (holding that "red flags” only established constructive knowledge); Mukamal v. BMO Harris Bank N.A. (In re Palm Beach Fin. Partners, L.P.), 488 B.R. 758, 773 (Bankr.S.D.Fla.2013) ("[T]he Plaintiff fails to recognize that implied actual notice is also not the same as actual knowledge. In fact, implied actual notice is defined as notice inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not [use], or as it is sometimes called implied actual notice.” (second alteration in original) (internal quotation marks omitted)).

. R.73-35.

. See Appellee’s Br. 7 (recognizing that it was "PWM [that] analyzed Johnson's liquidity”).

. See R.214 at 58 (testimony of Chris Barsi, PWM vice-president, that Rhodes would not have received the credit memorandum and that the memorandum was not included in the KYC report).

. R.216 at 41. Amegy submitted that Alex. Brown failed to investigate because "they don’t care about Texas banks” and “[t]hey certainly don’t care about [Amegy].” Id. Instead, Alex.Brown was "more concerned with getting paid.” Id. While Alex.Brown’s conduct may be objectionable, it does not allow a jury to infer that, by failing to investigate, it is liable as though it had known about Amegy’s security interest.

.Indeed, the majority twice relies on Rhodes's "access” to Johnson’s financial information. See Majority Op. at 929 (noting that Rhodes "obtained access to much of Johnson’s financial information”); id. at 929 (noting that “Rhodes again investigated [Johnson's] financial situation”).
To the extent that the majority concludes that, because Rhodes had the opportunity to review Amegy’s financing statement after viewing the KYC report, the jury may infer that he, did so, it effectively adopts a constructive knowledge standard.

. Appellee's Br. 41.

. To support its timing argument, Amegy relies on SEC v. Credit Bancorp, Ltd., 386 F.3d 438 (2d Cir.2004), a case that has nothing to do with § 8-115. In Credit Bancorp, the Second Circuit addressed whether a securities intermediary had an awareness of an adverse claim under U.C.C. § 8-105. See id. at 448 ("At issue in this appeal is whether Deutsche Bank had notice under U.C.C. § 8-105(a)(2).”); see also O.C.G.A. § 11-8-105(a)(2) (providing that a person has notice of an adverse claim if "[t]he person is aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim”). The court held that the "chronology of events” suggested that the bank was aware of facts that indicated a significant probability of an adverse claim to the shares of stock at issue. See Credit Bancorp, Ltd., 386 F.3d at 451. Because the bank was aware of those facts, it had a duty to investigate. See id. at 452-53. Unlike § 8-105, § 8-115 does not impose a duty to investigate when an intermediary is aware of facts that indicate a probability that an adverse claim may exist. Accordingly, even if the facts in the two cases were analogous, Amegy’s reliance on Credit Bancorp is misplaced. The timing of Rhodes’s phone call with Johnson therefore does not support an inference that Rhodes knew about Amegy’s interest in the Host Hotels stock.

.To support the opposite conclusion, the majority relies on Avenue CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287 (11th Cir. *941 2013), another case that has nothing to do with § 8-115. The evidence presented in that case, however, highlights the dearth of evidence here. In Avenue CLO Fund, the plaintiff had to prove that Bank of America had actual knowledge that Fontainebleau had funded Lehman’s payment. See id. at 1297. The plaintiff supplied evidence (1) that Bank of America received correspondence "suggesting” that Fontainebleau had made the payment in place of Lehman, (2) that an individual who knew that Fontainebleau had made Lehman's payment may have told Bank of America, (3) that Bank of America had attended a meeting with Fontainebleau where they discussed the implications of Lehman’s bankruptcy, and (4) that Fontainebleau was ”suspicious[ly] evasive[] on the topic of Lehman’s bankruptcy and [provided] nonrespon-sive answers to Bank of America’s questions about who funded Lehman's share of the September Advance.” Id. The court concluded that, "taken together and viewed in the light most favorable to the [non-moving party], . -.. this circumstantial evidence create[d] a genuine issue of material fact with respect to whether Bank of America had actual knowledge that Fontainebleau paid Lehman's share of the September Retail Advance.” Id.
The decision of our colleagues in the Sixth Circuit in Aetna Casualty & Surety Co., relied upon by Amegy even though it has nothing to do with § 8-115, also stands in marked contrast to the present situation and clearly demonstrates the lack of evidence here. The Sixth Circuit held that a' reasonable jury could conclude that KeyBank, through its employee, knew that its customer, Leahey Construction Co. ("Leahey”), was engaging in tortious, fraudulent conduct. Leahey committed fraud by capitalizing a business through a short-term loan in order to receive bonding. The court noted that there was evidence that the barde had a prior relationship with Leahey, that the bank knew that Leahey would need funds, that the bank's documents revealed that it was informed by Leahey that the purpose of the loan was to obtain approval from a new bonding company, that the funds were requested for the end of the month, and that, although it was a thirty-day agreement, the bank expected the funds to be returned in two days. See Aetna Cas. & Sur. Co., 219 F.3d at 535. The court relied on KeyBank’s experience at processing loans for similar purposes, noting that, "as a bank officer who had previously processed loans for bonding purposes, he knew enough to realize that adding significant funds to a company's bank account for only a four-day period would not serve to meet a bonding company’s capitalization requirements.” Id. at 535-36. This conclusion was bolstered by the fact that "Leahey stressed to [KeyBank] that the funds would have 'to be there’ at month-end, but would likely be returned to KeyBank immediately thereafter.” Id. at 536. Accordingly, the bank knew the purpose for which the funds were being requested, and the nature of the transaction itself indicated that it was fraudu- • lent. With access to this information, the jury reasonably could find that the bank knew that Leahey was engaging in tortious conduct.

. Rhodes testified that "he had done the exact identical transaction .,,, including the hurry up, get it done quickly,” with Johnson while he was at Lehman Brothers, and that Johnson "was always like that.” R.214 at 219.

. Id. at 236.

. Id.

. Id. at 238. Rhodes also testified that “[t]he broker dealer side doesn’t run KYC reports the same way the bank does” and that he had never run a KYC report while he was at Alex.Brown. Id. at 248. He stated that the process used by brokerage firms is at "a much lower level because ... we’re not really worried about what [the customer’s] liabilities are.” Id. Rhodes further testified that, in reviewing the KYC report, he was responsible for reviewing "negative media.” Id. at 249. He stated that, in reviewing the KYC report, he was "not experienced enough with UCCs or that to know” whether the U.C.C. lien information indicated that there was a lending relationship between Johnson and Amegy. Id. at 253.

. Pursuant to the Supreme Court’s decision in Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), we previously have recognized that a jury can "conclude the opposite of [a] witness’s testimony ... only if the record contains affirmative evidence of the opposite conclusion.” Smith v. Metro. Sec. Servs., Inc., 537 Fed.Appx. 864; 869 (11th Cir.2013) (per curiam). Our holding, albeit non-prece-dential, comports with the majority rule in the federal courts of appeals. See Walker v. Waltham Hous. Auth., 44 F.3d 1042, 1049-50 (1st Cir.1995) (noting "[mjost of the authorities say that one side cannot carry its affirmative burden of proof on a fact by pointing to the possibility that the jury disbelieved the other side’s denial of the fact”); 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2527 (3d ed. 2008) ("The party with the burden of proof does not make an issue for the jury’s determination by relying on the hope that the jury will not trust the credibility of the witnesses. If all of the witnesses deny that an event essential to the plaintiff's case occurred, the plaintiff cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event in question actually occurred.”).

. R.60 at 5.

. R.112 at 3; see also id. at 5 (submitting that “Rhodes had received actual notice of Amegy’s secured lien”).

. R.213 at 127.

. Id. at 127-28.

.Id. at 130.

. Id. (emphasis added).

. Id. at 131.

. R.216 at 39-40 (emphasis added).

. Id. at 40-41.

. R.215 at 94; accord id. at 151. He concluded that he “fóllow[ed] standard recognized business practices during the process of selling Mr. Johnson's shares and ... the funds being wired out to his account in JP Morgan Chase.” Id. at 119.

. The official comments explain that the policy of § 8-115 "is similar to that of many other rules of law that protect agents and bailees from liability as innocent converters.” O.C.G.A. § 11-8-115 cmt. 2 (noting that "general tort law protects agents or bailees who act on the instructions of their principals or bailors”).